1  Richard D. Coffinger (#03040)
   6838 N. 58th Drive
2  Glendale, AZ 85301
   Telephone (623) 937-9214
3  Facsimile (623) 937-7072
   Email: r.coffinger@gmail.com
4
   Tom Crowe (#002180)
5  CROWE & SCOTT, P.A.
   1100 E. Washington St.
6  Suite 200
   Phoenix, Arizona 85034-1090
7  Telephone (602)252-2570
   Facsimile (602) 252-1939
8  Email: tom@crowescott.com

9  Attorneys for Petitioner

10              UNITED STATES DISTRICT COURT

11                  DISTRICT OF ARIZONA

12  ERIN RAE ESPINOSA,                )    CASE NO.
                                      )
13              Petitioner,           )    **PETITION FOR A WRIT OF**
                                      )    **HABEAS CORPUS UNDER**
14                                    )    **28 U.S.C. § 2254 BY A PERSON**
                vs.                   )    **IN STATE CUSTODY**
15  CHARLES L. RYAN, DIRECTOR         )
    OF THE ARIZONA DEPARTMENT         )
16  OF CORRECTIONS                    )
                                      )
17              Respondent,           )    (**NON-DEATH PENALTY**)
                                      )
18              and                   )
                                      )
19  THE ATTORNEY GENERAL OF           )
    THE   STATE OF ARIZONA,           )
20                                    )
                Additional Respondent,)
21  _____  )

22       Petitioner, ERIN RAE ESPINOSA, by and through her undersigned counsel, hereby

23  submits her Petition under 28 U.S.C. §2254 for a writ of habeas corpus by a person in state

24  custody (non-death penalty).

25                      **TECHNICAL INFORMATION**

26  1.    Petitioner is challenging the judgment of guilt and sentence imposed upon her on

27        December 28, 2016, in the Superior Court of Arizona in and for Maricopa County,

28        in Case No. CR 2014- 006004-001, by Commissioner Virginia  Richter, a judge pro

tem thereof. (Appendix Exhibit A).  The address of the court is: Clerk of Court - Criminal Division, 175 W. Madison Street, 12th Floor, Phoenix, AZ 85003-2243.

2.   Comm. Richter entered her judgement and sentence, based upon the juries' verdicts (Appendix Exhibit B) returned in her second and third jury trials, on October 27, 2016 and November 29, 2016, respectively.  Petitioner was found guilty of "the charged offense" in Count 1 of the information (Appendix Exhibit C).  It was filed on December 22, 2014 and charged her with the offense of Aggravated Driving While Under the Influence (DUI) (of a prescription drug -clonazepam) (while her driver license was revoked or restricted as a result of a prior DUI conviction) a class 4, non-dangerous, non-repetitive felony, in violation of Arizona Revised Statutes (A.R.S) § 28-1383 (A) (1).  The information alleged petitioner committed the charged offense on August 18, 2011.  The charged offense was the **sixth** criminal prosecution filed by prosecutors representing the State of Arizona against petitioner, during the 3 ½ years following her arrest by Peoria, Arizona Police Officer Charles Kunde (# 6857) on August 18, 2011, for the **same** alleged DUI offense.

3.   Ms Espinosa was convicted of this offense, based upon the jury's guilty verdict returned during her second trial.  Immediately after that jury returned its guilty verdict, it was discharged by Comm. Richter, on the state's motion, which was not opposed by petitioner, prior to that jury being re-administered an oath to render a true verdict during the trial on the state's sentence enhancement allegation.

4.   The state made the motion to discharge the second jury because petitioner had made an emotional outburst, in the presence of the jury, after the clerk had read the jury's guilty verdict. Petitioner had been standing, facing the jury, in front of her chair at defendant's table, while the clerk was reading the jury's verdict.  When the clerk read the word, "Guilty", petitioner dropped to the floor in a fetal position, and began crying loudly and loudly praying for divine help.  She continued with her emotional outburst while the clerk was polling each of the members of the jury to determine whether there was unanimity in the jury's guilty verdict.

5.     The state's sentence enhancement allegation, (Appendix Exhibit D), alleged that petitioner had committed the charged offense while she was released from confinement on probation for her two prior concurrent class 6 un-designated felony offenses.   These concurrent convictions, were entered in the Maricopa County Superior Court, on September 28, 2010, in Case No. CR 2009-126740-001 by Comm. Carolyn Pasamonte, for the crime of aggravated DUI  (intoxicating liquor) (with child under  14 years of age in vehicle).   These offenses were both designated misdemeanor offenses before the state filed the charged offense.

6.     A.R.S.  § 13-604(A), provides that a class 6 un-designated offense "shall be treated as a felony for all purposes **until such time as the court may actually enter an order designated the offense a misdemeanor**."  [Emphasis Supplied].   This statutory provision was first adopted by the Arizona Legislature effective January 1, 1992 in former A.R.S. § 13-702(G).  On January 2, 2015, Petitioner's re-filed her timely motion to strike the state's sentence enhancement allegation, (Appendix Exhibit E).  She had previously filed it in a prior prosecutions against her for the same offense.  Her motion to strike argued that, although, on the date of the charged offense, she was released from custody on probation for  her two prior class 6 un-designated felony offenses, they were no longer felony offenses because on March 7, 2012, Maricopa County Superior Court Comm. Phemonia Miller, designated both of them as class 1 misdemeanors.   As a result, Comm. Richter's January 5, 2015 order denying petitioner's motion to strike the state's sentence enhancement allegation, entered on the record, on (Day One) of petitioner's first jury trial, prior to  jury selection, ([Court] Reporter's 1/5 2015  Transcript (R.T.) Page 20, line 21 (Appendix Exhibit F), violated  petitioner's right to due process of law, guaranteed by the 14th Amendment of the U. S. Constitution, by allowing the state to unlawfully enhance her sentence, which subjected her to the minium, mandatory 2 ½ prison sentence she received.

7.     In petitioner's third jury trial, the jury returned its verdict, in which it stated its

3

finding that the state had proven its sentence enhancement allegation against petitioner beyond a reasonable doubt.

8.  On December 28, 2016, following her entry of her judgement, Comm. Richter sentenced petitioner to be incarcerated in prison, in the custody of the Respondent Arizona Department of Corrections for the "presumptive" sentence of 2 ½ years, which was the minimum sentence authorized under Arizona law, due to the third jury's verdict that the state had proven the state's sentence enhancement allegation beyond a reasonable doubt. Petitioner is currently in the custody of Respondent Charles L. Ryan, Director of the Arizona Department of Correction (A.D.O.C.). The A.D.O.C. has assigned her inmate No. 315531, and she has a currently scheduled release date of November 3, 2018, with a current sentence expiration date of February 1, 2019, as reflected in her attached A.D.O.C. inmate record, (Appendix Exhibit G).

9.  On December 28, 2016, immediately after Comm. Richter imposed her judgment and sentence, petitioner filed a timely Notice of Appeal, (Appendix Exhibit H), by which she commenced her direct appeal to the Arizona Court of Appeals, Division 1, from the superior court's judgement and sentence. The court of appeals assigned her direct appeal Case No. 1 CA-CR 17-0001.

10. In petitioner's opening brief ("O.B."), (Appendix Exhibit I) and reply brief ("R.B"), (Appendix Exhibit J) she presented the following seven arguments, each of which, she claimed established, reversible error in the superior court, entitling her to a reversal of that court's judgement and sentence. In this petition she has substituted the words, "petitioner" and "the state" for the words, "appellant" and "appellee," respectively.

## ARGUMENTS

I.  The State's Trial Counsel Committed Numerous Intentional Acts of Prosecutorial Misconduct, to Gain a Tactical Advantage, Which Included His Lack of Candor Toward the Tribunal, That When Combined, Violated

4

Petitioner's Right to Due Process of Law.

II.  The Superior Court Committed Reversible Error By Denying Petitioner's Motion to Preclude the State From Presenting at Trial, Argument and Evidence in Support of Its Alternative Legal Theory That the State Had Waived at Petitioner's Preliminary Hearing, in Violation fo the Doctrine of Judicial Estoppel.

III. The Superior Court Committed Reversible Error by Denying Petitioner's Motion to Strike the State's Sentencing Enhancement Allegation That She Committed the Charged Offense While On Probation For a Prior Felony Offense Because Her Prior Class 6 Undesignated Aggravated DUI Offenses Were Designated as Misdemeanors Prior to the Date (1) the State Filed the Charge, and (2) the State Filed Its Allegation.

IV.  The Superior Court Committed Reversible Error by Denying Petitioner's (1) Motion for Dismissal, With Prejudice, Based Upon the Superior Court's *Sua Sponte* Mistrial Declaration, Without Either a Manifest Necessity or Petitioner's Consent, and (2) Motion for Directed Verdict of Acquittal, Pursuant to Rule 20, Ariz.R.Crim.Pro, That She Made In Her Second Trial After the State Rested Its Case-in-Chief.

V.   The Superior Court Committed Reversible Error by Denying Petitioner's Second Motion for Reconsideration of her Motion to Suppress the State's Drug Content Analysis of her Blood Sample Because the State Waived Its Alternative Argument, Pursuant to A.R.S. §13-3925, by Failing to Preserve This Argument in the Superior Court.

VI.  The Superior Court Committed Reversible Error by Denying Petitioner's Motion for Alternative Relief, Including Dismissal of the Charge, With Prejudice, Based on the State's Violation of Its Duty to Collect and Preserve Until Time and Trial, a Sample of Her Blood for Her Independent Chemical Analysis.

VII.   The Superior Court Committed Reversible Error by Its Rulings Relating to the Admission or Preclusion of Evidence, Discovery Issues, Jury Instructions, and Motions to Quash Subpoenas.

11.   In the five arguments petitioner presented in her direct appeal, excluding Arguments 2 and 7, she claimed reversible error had occurred in the superior court based upon violations of her rights guaranteed under the U. S. Constitution. She re-asserts herein these five arguments, and further claims that except for Arguments 2 and 7, the errors in the  superior court were not only reversible errors but were also errors in violation of petitioner's rights, guaranteed under the U.S. Constitution, entitling her to have this court grant her federal habeas relief.

12.   Prior to presenting the above listed Arguments 3 and 4 to the Arizona Court of Appeals, Div. 1 and the Arizona Supreme Court in her direct appeal, petitioner presented these arguments to these courts in her petition for special action and her petition for review filed in the supreme court in which she sought that court to review the court of appeal's order declining to accept jurisdiction of her petition for special action.   In those proceedings she sought interlocutory appellate relief from the superior court's (1) denial of her motion to strike the state's sentence enhancement allegation and (2) her first argument in Argument 4 which, was based upon the superior court's *sua sponte* declaration of a mistrial, during her first trial, that was granted without either a manifest necessity or petitioner's consent and, her second argument, in Argument 4, that the superior court had erred by its denial of her motion for a directed verdict of acquittal, pursuant to Rule 20, Ariz.R.Crim.Pro., made after the state rested, in her first trial.   On February 26, 2015, petitioner filed her petition for special action in the Arizona Court of Appeals, Div. One.   That court assigned it Case No SA-15-0047.   The following day, on February 27, 2015, prior to receiving any response from the state, a three judge panel of that court, consisting of Presiding Judge Margaret H. Downie, with Judges Patricia K. Norris and Randall M. Howe participating, issued an order, in the exercise of its discretion, declining to accept

jurisdiction of petitioner's petition for a special action.  On March 4, 2015, petitioner filed in the Arizona Supreme Court a timely petition for review of the court of appeals ruling.  The Arizona Supreme Court assigned it Case No. CV-15-0073.  On September 22, 2015, the supreme court denied petitioner's petition for review. Appendix Exhibit K includes copies of all documents filed in petitioner's petition for special action in the Court of Appeals Div. 1 and in her petition for review, filed in the supreme court.

13.     On February 21, 2017 petitioner filed in the court of appeals a motion for that court to take judicial notice of (1) its own records in another related case (petitioner's special action) and (2) records of related cases in other inferior courts (Appendix Exhibit L). On May 12, 2017 Judge pro tem Anthony Mackey granted petitioner's unopposed motion for the court of appeals to take judicial notice of these other cases. (Appendix Exhibit M)  By this order the court of appeals took judicial notice of records in her following listed related cases: (1) her petition for special action filed on February 26, 2015, in Div. 1 Court of Appeals, Case Number 1 CA-SA 15-0047, entitled, "*Erin Rae Espinosa v. The Hon. Virginia Richter, Commissioner of the Superior Court of the State of Arizona, in and for the County of Maricopa, and State of Arizona, ex. rel. William G. Montgomery, Maricopa County Attorney,*"("petitioner's special action"), and (2) records from cases the state filed against petitioner in inferior courts, in which the state previously charged petitioner five times with same DUI (prescription drug) offense that is the subject of this appeal, and later moved and obtained dismissals, without prejudice: (1) Peoria City Court Case No. TR2012-001138; (2) Maricopa County Superior Court Case No. CR2013-441390; (3) Maricopa County Superior Court Case No. CR2014-001538; (4) Maricopa County Superior Court Case No. CR2014-002044 (indictment); (5) Maricopa County superior Court Case No. CR2014-.002044 (direct complaint dismissed because the state failed to file a timely information).  Each of the five charges, the state's motions to dismiss, without prejudice, and the orders granting

dismissal, were included as exhibits to respondent's motion to seal, filed in superior court (R.A. 227) and are included in Petitioner's Supplemental Appendix as Item 1.

14.    On August 30, 2017, in petitioner's direct appeal, a three judge panel consisting of Presiding Judge Michel J. Brown, with Judges Jennifer B. Campbell and Margaret H. Downie, concurring, entered an order (Appendix Exhibit N) granting the state's motion to strike petitioner's initially filed O.B. stating:

> " The court concludes that respondent's opening brief. . .(2) improperly incorporates by reference arguments made in trial court pleadings and in a related special action proceeding, . . .. Therefore, IT IS ORDERED striking the opening brief filed in this matter on July 11, 2017." [Emphasis Supplied]

Petitioner submits that these two orders by the court of appeals are arguably inconsistent. The first order granted petitioner's motion for the court to take judicial notice of related cases and the second granted the state's motion to strike her initially filed O.B., in part, because it included references to arguments she made in the judicially noticed court records. As a result of the state's success in striking her initially filed O.B., she has presented in her federal habeas petition all of her arguments she presented in both of her briefs and her petition filed in her direct appeal. Petitioner realizes that presenting her arguments in this manner has caused her petition to be lengthy, however she has followed this procedure in order to avoid any claim by the state that she has waved any of these arguments by improperly incorporating by reference in this petition any arguments she made in her direct appeal.[1]

---

[1] In *Lockheart v. Hulick,* 443 F.3d 927 (7th Cir. 2006), the U.S. Court of Appeals for the 7th Cir., similarly stated:

To preserve a claim for federal collateral review, the petitioner must "fairly present" it such a way that a judge could grasp both its substance and its foundation in federal law. *Baldwin v. Reese,* 541 U.S. 27, 124 S.Ct. 1347, 158 E.Ed.2d 64 (2004), concludes that this requirement is not met if a judge must go outside the four corners of the document in order to understand the contention's nature and basis. *Baldwin* held that, if the state's Supreme Court must read the decision of its appellant court in order to learn what the petitioner is arguing, then the issue has been preserved for federal decision; a petition must *contain* each contention, and not just point to some other document where

8

15.   On March 13, 2018, a three judge panel of the Arizona Court of Appeals, Div.1, issued a Memorandum Decision (M.D.), (not for publication), (Appendix Exhibit O), in petitioner's direct appeal.  The M.D. was  written by the Hon. Judge Jon W. Thompson, with the Hon. Judge Peter B. Swann and the Hon. Judge James P. Beene, concurring.  The M.D. affirmed the superior court's judgement and sentence, and rejected  all  of petitioner's arguments that she was entitled to have the superior court's judgment of guilt and sentence reversed based upon her arguments of specific instances of reversible error that had occurred in the superior court.

16.   On April 11, 2018, petitioner filed, in the Arizona Supreme Court, her timely petition for review, (Appendix Exhibit P), in which she seeks review and relief  by that court- Arizona's highest state court-  from the final order of Div. 1 of the court of appeals in her direct appeal.  The Arizona Supreme Court assigned it Case No. CR-18-0191-PR.

17.   In her petition for review, petitioner raised all five of the seven numbered arguments she previously listed herein, that she raised in her direct appeal, excluding arguments 2 and 7.  Petitioner concedes that she has waived these two arguments in her federal habeas petition by failing to present them to the highest state court.  As of the date of her filing of this federal  petition, the Arizona Supreme Court has not yet, either (1) ruled on her pending petition for review, or (2) issued any briefing schedule or other order indicating the date when that court will either deem petitioner's petition for review  "At Issue" or issue its ruling thereon.

## JURISDICTION

18.   However petitioner has satisfied the statutory "exhaustion" requirements for this court's federal habeas corpus jurisdiction for a state court prisoner, because  "the exhaustion requirement is satisfied when the substance of the federal claim has been

---

it might be located. [Emphasis supplied]

fairly presented to the highest state court." *Picard v. Connor*, 404 U.S. 270 (1971), *Mc Quown* v. *Mc Cartney*, 795 F.2d 807, 809 (9th Cir. 1996).

19. Petitioner satisfied the "exhaustion" requirement when she filed her timely petition for review, which included her substantive arguments in support thereof, that she presents herein and presented in her direct appeal, except for Arguments 2 and 7, which she does not present herein.

20. Petitioner has not filed a petition for certiorari in the United States Supreme Court, nor filed any other petitions, applications or motions concerning her judgment and sentence in any state court, other than her direct appeal, previously described herein.

21. Petitioner currently satisfies the state "custody" requirement of 28 U.S.C. § 2254 because, as of the date of her filing of this petition, she remains in the custody of Respondent A.D.O.C., and its Director, Respondent Charles L. Ryan, during her continuous incarceration at the Perryville Women's Prison, in Goodyear Arizona, from the date of her sentencing, on December 28, 2016.

22. As a result of her current state court incarceration, this court acquired its federal habeas corpus jurisdiction over this petition, when it was timely filed. This court will continue to retain such jurisdiction, regardless of whether she is released from state custody before her federal habeas claims are resolved because, as a result of her felony conviction in the charged offense, she will continue to suffer the "collateral consequences of her felony conviction. *Carafas* v. *LaValle*, 391 U.S.234, 238 (1968).

23. If the Arizona Supreme Court **grants** her pending petition for review, and the relief she requested therein, then, petitioner **will not** be subjected to various, adverse "collateral consequences" that she has and will continue to suffer as a result of her felony conviction in the charged case. In that event, this petition will become moot. However, if that court **denies** her petition for review and the relief she requests therein, then she **will** continue to suffer these adverse "collateral consequences" and, as a result, this petition will **not** become moot. *Carafas v. LaVallee*, 391 U.S. 234

(1968) holds that the federal habeas jurisdiction vested in the federal court as a result of the petitioner being in state custody when the petition is filed, is not affected by the petitioner subsequent release from custody. The *Carafas* court focused on the various "collateral consequences" of a conviction that still remained. It stated, "In consequence of [petitioner's] conviction, he cannot engage in certain businesses; he cannot serve as an official of a labor union for a specified period of time; he cannot vote in any election...; he cannot serve as a juror.... On account of these 'collateral consequences' the case is not moot." 391 U.S. at 237-238, 88 S.Ct. at 1559.

24.    It would be in the interest of this court's judicial economy to defer any further consideration of this petition until after the Arizona Supreme Court has finally adjudicated her petition for review because, in the event that she obtains relief from that court, this court will not have to address petitioner's arguments presented herein. Accordingly, petitioner will file with this court, at the time her filing this petition, a motion for stay and abeyance, pursuant *Rhines* v. *Webber*, 544 U.S.269 (2005) and *Mena* v . *Long*,  813 F.3d 907  (9th Cir. 2016).

## PERSONAL INFORMATION

25.    Erin Rae Espinosa, age 45, was born and raised in Vancouver, British Columbia, by her biological parents. She is a permanent U.S. resident.  She is the second of two children.  She began drinking at the age of 14 and has significantly increased her alcohol consumption over the years.  She also struggles with what has been diagnosed as clinical anxiety.  She has a master's degree in business administration from the Thunderbird School of International Management, now part of Arizona State University in Glendale, AZ.  She is married to her husband Todd, a homemaker and is the mother of two children Kayla and Evan (ages 12 and 14).

26.    Ms. Espinosa has been diagnosed with clinical anxiety and ADHD.

27.    On August 18, 2011 and through her first and second trials, Ms. Espinosa was taking medication prescribed by her treating physician Dr. Jack Hawks, D.O.  She was prescribed 1 mg clonazepam up to three times per day as needed for anxiety,

11

including one additional dose at night to help her sleep.

28.   Dr. Bisla has counseled Ms. Espinosa from 2010 to 2016 for her extreme anxiety regarding the DUI cases that have been filed against her.  Ms. Espinosa has never been charged with or convicted of any criminal offense except for the 2009 DUI Alcohol cases and the case which involved her DUI prescription drug case committed on August 28, 2011.

29.   Ms. Espinosa has been prosecuted six times for the same DUI offense, including three jury trials.  She has had numerous anxiety attacks due to length of this prosecution and the number of her court appearances, culminating with her emotional outburst on October 27, 2016, after the clerk read the jury's guilty verdict.

## PROCEDURAL AND FACTUAL BACKGROUND

**A.    The State's five prior cases filed against Petitioner for the same DUI / Prescription drug offense – all of which were dismissed, without prejudice, on the State's motion**

[Note: the following paragraphs were included the "Statement of the Case" section in petitioner's O.B. from pages 7 to 21; which petitioner has edited by omitting matters otherwise set forth in her petition]:

30.   On February 8, 2012 – nearly six months after petitioner's arrest - the state first charged her with the DUI offense as a Class 1 misdemeanor, in a complaint filed in the Peoria Municipal Court, Case TR2012-001138.  On April 4, 2013, - 14 months after the charge was filed - the day before her scheduled jury trial, Presiding Judge George T. Anagnost, dismissed that complaint, without prejudice, on the state's motion "so that the case could be submitted to the Maricopa County Attorney's Office for felony consideration." The state then re-charged petitioner with the same DUI offense - as a Class 4 felony – in three indictments filed in three separate cases in the Maricopa County Superior Court. All of these cases were assigned to one of the two Criminal Division - DUI Courts, established in 2003, by then Presiding Judge Colin Campbell because:

1
2
3
4

DUI cases involve a specialized area of the criminal law and, therefore, the assigned judges in the two DUI courts [would] become more familiar with and knowledgeable of this specialized area of the law. As a result of assigning all of the DUI cases to the two DUI courts, the other criminal division judges would not be required to become "immersed in the DUI subculture." In *State v. Velasco*, 165 Ariz. 480, 487, 799 P.2d 821 (1990), the supreme court stated, "This court's immersion in the subculture of DUI practice has not been entirely satisfactory." [R.A. 80 and 83]

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

The three indictments, which were filed in the following cases, were all dismissed, without prejudice, on the state's motion: (1) CR2013-441390[1], filed on October 18, 2013, dismissed on February 28, 2014, by Comm. Phemonia Miller; (2) CR2014-001538[2], filed on April 11, 2014, dismissed on July 9, 2014, by Comm. Charles Donofrio III; and (3) CR2014-002044[3], filed on June 25, 2014, dismissed on September 23, 2014, by Comm. Brian D. Kaiser. The state moved to dismiss each indictment, without prejudice, because petitioner's three Rule 12.9 [Ariz.R.Crim.Pro.] motions for a new finding of probable cause had been granted due to the state's failure to properly instruct each grand jury panel as to **all** of the elements of the charged offense. The state repeated its error by omitting from its jury instructions the non-statutory, judicially imposed element of the crime established by the supreme court in *State v. Williams,* 144 Ariz. 487, 698 P.2d 732 (1985). The *Williams* court held that, the crime of aggravated DUI while driver license and/or privilege was revoked or restricted for a DUI, included the non-statutory element that the defendant knew or should have known of such revocation or restriction (the non-statutory *Williams* element). The state followed its normal practice at the Maricopa County Attorney's Office (MCAO) of providing grand jurors with the elements of criminal offenses that they would likely have to consider during their term. After the newly empaneled grand jurors were administered their oath by the empaneling judge – prior to being presented any cases - the prosecutor attending the grand jury proceeding played a digital recording of the reading of numerous

25
26
27
28

---

[1] This indictment – the state's second charge against petitioner – alleged two count of Aggravated DUI (prescription drug) in violation of A.R.S. § 28-1383(A)(1) and (4), "while driver license revoked or restricted" and "while ordered by the court or required pursuant to A.R.S. § 28-3319 by the Department to equip the motor vehicle with a Certified Ignition Interlock Device," respectively.

[2] This indictment – the state's third charge against petitioner – alleged only one count of Aggravated DUI, the same offense alleged in Count 2 of the previous indictment in CR2013-441390.

[3] This indictment – the state's fourth charge against petitioner – alleged only one count of Aggravated DUI, the same offense charged in Count 1 of the indictment in CR2013-441390.

Arizona criminal statutes, including A.R.S. § 28-1383(A)(1) ("the reading of the statutes"). The state followed this procedure for instructing the grand jurors as to the applicable law before the 595th, 610th, and the 611th Maricopa County Grand Juries, that all returned indictments against petitioner. By following this procedure, without including the non-statutory *Williams* element, either at the time of the reading of the statutes or during the presentation of a case in which the jurors were being asked to consider charging the crime of aggravated DUI, the state failed to instruct all of these grand juries as to all of the elements of this crime.  The state could easily have cured this omission by simply reading the grand jurors Recommended Arizona Criminal Instruction RAJI 28.1383 (A)(1)-1, which includes the non-statutory *Williams* element. Also, during the state's first grand jury presentation against petitioner, in CR2013-441390, Comm. Miller ruled that there was a separate basis for her order granting petitioner's Rule 12.9 motion because, in spite of the fact that the state had received a prior written request from petitioner for the state to inform the grand jurors of petitioner's request that she be allowed to testify before them, the state failed to provide this notice. This omission violated the Arizona Supreme Court's holding in *Trebus v.  Davis,* 189 Ariz. 621, 944 P.2d 1235 (1977).

In CR2014-002044, after the indictment was dismissed without prejudice, the state charged petitioner with the same offense in a direct complaint, which was the state's fifth charge against petitioner. On October 15, 2014, Comm. Jacqui Ireland presided over a preliminary hearing and found that the state had established probable cause to hold petitioner to answer to stand trial, however, the state failed to file a timely information in that case.  On November 7, 2014, petitioner filed a motion to dismiss the direct complaint in that case, without prejudice, pursuant to Rules 13.1(c) and 16.1(b), Ariz.R.Crim.Pro., based on the state's failure to file a timely information within ten days after Comm. Ireland's probable cause finding. The state conceded that this fundamental charging omission deprived the court of jurisdiction to try petitioner, pursuant to Art. 2, § 30, of the Arizona Constitution. On November 24, 2014, Comm. Charles Donofrio III dismissed the

direct complaint in that case, without prejudice, on the state's motion, due to the state's concession of its failure to file a timely information.

**B.     The Charged Offense**

31.     On November 21, 2014, the state filed a direct complaint in CR2014-006004-001. On December 22, 2014, Comm. James Rummage presided over a preliminary hearing on the direct complaint in the charged offense. At the conclusion of the preliminary hearing, in response to petitioner's argument that the state had not established probable cause to believe that petitioner committed the offense while her driver license or privilege was **restricted for a DUI,** the state expressly waived this legal theory, and it relied solely upon its legal theory that she committed the offense while her driver license or privilege was **revoked**.

+ + +

Also on December 22, 2014, petitioner filed a notice of the impending expiration of her Rule 8.2(c) speedy trial time limit, in which she noted that the last day for her trial was on January 5, 2015 [R.A. 14].  This date became the "last day" for her trial in this case because it was the "last day" in her previous case that had been dismissed, without prejudice, due to the state's failure to file a timely information. On January 5, 2015, acting Master Calendar Division Judge Joseph Kraemer assigned petitioner's case for trial that day to Comm. Virginia Richter [R.A. 53], who was not assigned to either division of the two DUI courts.

+ + +

Petitioner filed her motion to suppress the state's evidence of the drug content analysis of her blood sample [R.A. 93], based upon the Admin Per Se Implied Consent Admonitions read to her by Peoria Police Officer Sean Privett (#3062), that were printed on the back side of the ADOT Form 40-5807, revised in December of 2008. These admonitions were inherently coercive, due to the statements, included four times, that "Arizona law requires you" to submit to designated test. Due to the inherently coercive nature of the admonitions, petitioner's blood samples were

15

obtained in violation of petitioner's right to be free from unreasonable searches and seizures, guaranteed by the Fourth Amendment of the U.S. Constitution[4].

The state's response to petitioner's motion to suppress [R.A. 39] failed to argue, as an alternative argument, the good faith exception to the exclusionary rule provided in A.R.S. § 13-3925. The state also failed to preserve this alternative argument for appellate review by failing to present it at oral argument on petitioner's motion [R.T. January 7, 2009, p. 9-13]. Comm. Richter denied petitioner's motion to suppress [R.A. 64].

On April 26, 2016, - the same day the supreme court filed its opinion in *Valenzuela*, supra, and its companion case, *Brown v. McClennan*, 239 Ariz. 529, 373 P.3d 517, (2016), petitioner filed her second motion for reconsideration of the denial of her motion to suppress [R.A. 103]. In its response [R.A. 106], the state argued, **for the first time in the superior court,** the good faith exception to the exclusionary rule, provided in A.R.S. § 13-3925. On August 12, 2016, Comm. Richter conducted oral argument on petitioner's second motion for reconsideration, at which time petitioner argued that the state had waived the exception to the exclusionary rule, provided in A.R.S. 13-3925, by failing to include it in either its response to petitioner's motion to suppress or at oral argument on the initial motion to suppress. Comm. Richter denied petitioner's second motion for reconsideration [R.A. 122].

+ + +

On January 12, 2015 - the fourth day of petitioner's first trial - Comm. Richter entered her *sua sponte* order declaring a mistrial, because she had denied the state's request to call petitioner's trial counsel, as a rebuttal witness for the state, to examine him regarding his attorney-client conversations with petitioner about the restrictions imposed on her SIIRDL by A.R.S. § 28-1402. Comm. Richter scheduled the matter for a retrial on February 23, 2015. Petitioner then filed a motion to dismiss the

---

[4] In *State v. Valenzuela*, 239 Ariz.299, 371 P.3d 627 (April 26, 2016), the supreme court ruled that these admonitions were inherently coercive, thereby approving the validity of petitioner's argument in her motion to suppress.

information, with prejudice [R.A. 66], arguing that a retrial was barred by the U.S. and Arizona constitutional prohibitions against double jeopardy, because defendant did not consent to Comm. Richter's *sua sponte* order declaring a mistrial, and there was no manifest necessity for it. The state then filed its response to petitioner's double jeopardy motion to dismiss [R.A. 70] and petitioner filed her reply [R.A. 72]. Comm. Richter denied petitioner's double jeopardy motion in an order entitled "Ruiling" [*sic*][R.A. 75].

+ + +

Prior to petitioner's second trial, she filed a motion for the Master Calendar Judge Joseph Kramer to transfer petitioner's case back to a DUI court for retrial [R.A. 80]. Notwithstanding the fact that petitioner had submitted her motion to Judge Kramer, Comm. Richter denied it in an order entitled "Ruiling" [*sic*][R.A. 87][5]

More than 60 days before petitioner's second jury trial, she requested that the state notify the Peoria Police Department to release her blood sample for testing by her independent expert. The state informed petitioner that it had destroyed petitioner's

---

[5] Petitioner filed this motion because – unlike Comm. Richter, who was assigned to the non-DUI Criminal Division – the DUI court judges are only assigned DUI cases. As a result, the DUI court judges were more familiar with the DUI statutes and court opinions. Comm. Richter reflected her lack of familiarity with this specialized area of the law on multiple occasions, including the following:

   Comm. Richter's January 24, 2017, order denying petitioner's motion for a new trial, [R.A. 232], includes her citation of former A.R.S. §28-692(B), reflecting her understanding that that former statute remained in effect.  A.R.S. §692B -which established Arizona's former "DUI per se" offense of driving, or being in actual control of a motor vehicle, with an alcohol concentration above .10 -  was repealed and renumbered as modified in A.R.S. §28-1381(a)(2), by laws 1996, Ch. 76, §3, effective October 1, 1997;

   Comm. Richter's statements on October 18, 2016, made on the record, outside the presence of the jury, in which she indicated her erroneous understanding of the DUI statutes currently in effect, at which time the following proceedings occurred :

   The Court: …[A.R.S. §28] 692, which is driving while under the influence….[A.R.S. §28] – 694.

   Petitioner's and the state's trial counsel then corrected Comm. Richter, informing her that those were the *former* statute numbers that had been repealed,  at which time the following proceedings occurred:

   Deputy County Attorney Mr. Serden: Actually, those are old statues, Your Honor. Those are old DUI statutes.

   The Court: 692 is part of the old one.[?] 1381 is driving or actual physical control. 1382 is aggravated driving or actual physical control. [?] 1384 is aggravated. [?]

   Mr. Serden: 82 is extreme. 83 is aggravated.

   Mr. Coffinger: I agree with that.

   The Court: 82, 83, or 85. You want me to read - -

   Mr. Coffinger: 85 is not. ..a criminal statute. That's ad min per se.

   [Emphasis Supplied] [R.T. October 18, 2016,  p. 15-16]

entire blood kit in September of 2014, because it had inadvertently, prematurely sent a property Dispo[sition] Form to the Peoria Police Department, directing it to dispose of all evidence in its possession related to petitioner's case. Based upon petitioner's receipt of this notice of the destruction of her blood sample, she filed her motion to dismiss the charge, with prejudice, or in the alternative, to suppress the drug content analysis of her blood sample because the state had failed to preserve, until trial, a portion of her blood sample for petitioner's independent testing [R.A. 121]. The state conceded in its response [R.A. 136] that, on February 14, 2014, it had inadvertently, prematurely sent a Dispo[sition] Form to the Peoria Police Department, which directed it to "Release All Property" and, as a result, the police department had disposed of petitioner's blood sample that it has been preserving for analysis by petitioner's independent expert.

The state's second jury trial commenced on October 17, 2016. On October 20, 2016, after the state rested its case in chief, petitioner made a Rule 20 motion [R.T. 10/20/16, p.138, 160-164] which was denied. During petitioner's second jury trial – in both his opening statement and rebuttal closing argument – the state's trial counsel DCA Serdin engaged in multiple acts of intentional prosecutorial misconduct to gain a tactical advantage. Petitioner objected to all of his improper statements, which were all overruled by Comm. Richter.

On October 27, 2016, the jury returned a verdict of guilty.

+ + +

Following her release of the second jury, due to petitioner's emotional outburst during the clerk's reading of the guilty verdict, Comm. Richter then set a third jury trial on the state's sentencing enhancement allegation.

On November 28, 2016, petitioner's third jury trial commenced before Comm. Richter.

On December 28, 2016, Comm. Richter entered her judgment, based upon the jury's verdict, that petitioner was guilty of the charged offense committed while she was on felony probation. She then sentenced petitioner to serve a minimum term of imprisonment of two-and-a-half years in the Arizona Department of Corrections,

which sentence included all mandatory minimum DUI fines, surcharges and other assessments [R.A. 220, 223].  Comm. Richter's sentencing minute entry, on page 3, included the following immigration finding and order, none of which she actually entered in open court. [R.T. December 28, 2016; p. 8, 1.12][6]

> The court has been informed that the Defendant was born in Canada.  In addition, the Court has been presented with sufficient evidence that Defendant has been identified by federal authorities or a 287(g) officer as a person who is unlawfully present in the Untied States. [Emphasis Supplied]

Defendant has been a lawful permanent resident of the United States for the past 11 years and, therefore, there is no basis for Comm. Richter's finding and order. A copy of Permanent Resident card is included in the Supplemental Appendix to petitioner's opening brief as Item 2.

## C.   STATEMENT OF FACTS

32.   On August 18, 2011, at around 3:30 p.m., petitioner was in the driver seat of her 2002 Nissan Xterra SUV, at which time the vehicle's ignition key was in the ignition switch, the engine was running, and its standard transmission was in neutral. Her SUV was stopped in a line of vehicles in front of the West Wing Elementary School in Peoria, Arizona. She was waiting to pick up her two children who were enrolled at the school. She normally walked her children between home and school, a distance of only three blocks. Since it was a hot summer afternoon, petitioner wanted to give her children a ride home in her air conditioned SUV, so she drove to the school to pick them up. Petitioner had taken one of her prescription medication clonazepam [brand name Klonapin] pills that day, at 10:00 a.m., another at 2:00 p.m., and another at 3:15 p.m., as prescribed by her treating physician Dr. Jack Hawks, D.O., for her diagnosed condition of clinical anxiety.

Petitioner's SUV remained stopped for approximately five minutes, on an uphill,

---

[6]When there is a *conflict* between the minutes and a reporter's transcript, the circumstances of the particular case determine which shall govern. *State v. Rockerfeller*, 9 Ariz. App. 265, 262, 451 P.2d 623 (App.Div.1-1969) reh.den., rev.den.

inclined paved street in front of the school. She was wearing new shoes that fit

loosely on her feet. Her right foot then slipped off the brake pedal, causing her SUV

to roll slowly backwards, as a result of the force of gravity. The rear of petitioner's

SUV collided with the front of another SUV, owned and driven by Michelle Murphy

its sole occupant who is referred to as M.M., because she is a "victim" under the

Victim's Bill of Rights ("VBR"), Ariz. Const. art. 2, §2.1.[7]   M.M.'s SUV was

stopped behind petitioner's SUV, approximately five or six feet [Id. p. 59, l. 11-14].

M.M. was waiting to pick up her child from school. M.M. noticed petitioner had her

foot on the SUV's brake pedal because its brake lights were on for a good five or six

minutes. [Id. p. 59, l. 18-19] M.M. saw the SUV rolling backward with no brake

lights or reverse lights on [Id. l. 22-24], that resulted in a low speed collision, that

caused minor damage to the front-end of M.M.'s SUV that cost $1,661.64 to repair,

which was fully paid by petitioner's automobile liability insurance carrier, USAA.

[Id. p. 68, L. 3-9]  M.M. did not sustain any personal injury as a result of the

collision.

Officer Kunde (#6857) was present at the school where he had been working traffic

enforcement at the start of the school year. He was informed of the collision and

contacted both drivers. He determined that petitioner had not consumed any alcoholic

beverage but he suspected that she might be impaired from a prescription medication.

Petitioner told Officer Kunde, and later, Officer Privett, that she had taken a 1mg

tablet of clonazepam at the following times: 10:00 a.m., 2:00 p.m., and 3:15 p.m.

Officer Kunde escorted petitioner to the principal's office because the principal had

given him permission to use her office to conduct his DUI investigation of petitioner,

because he wanted to spare petitioner the humiliation of performing field sobriety

---

[7] In *State ex rel. Romley v. Superior Court, Maricopa County and Cunningham RPI*, 184 Ariz. 409, 411, 909 P.2d 476 (Ariz.Ct.App.Div. 1-1995), rev. den.,  the court held that, notwithstanding the fact that a DUI offense is a "victimless" crime, a person whose property was damaged as a result of the defendant's conduct has standing as a victim to receive restitution.

tests in front of the whole school and in front of her children. Officer Kunde administered a Preliminary Breath Test (PBT) to petitioner, which was negative for ethanol. Officer Kunde conducted a DUI investigation of petitioner, during which he administered field sobriety tests (FSTs) to her that, according to his training and experience, indicated her possible impairment.[Id. p. 88. l. 23-25] At the conclusion of Officer Kunde's investigation, he placed petitioner under arrest for DUI prescription drugs, a misdemeanor, rather than felony, aggravated DUI, because he verified that she had a valid Arizona Special Ignition Interlock Restricted Driver License (SIIRDL) authorized by A.R.S. §§ 28-1401 and 28-1402, that had been issued to her on March 8, 2011, [Id. p. 109, l. 1-14] by the Arizona Department of Transportation – Motor Vehicle Division (ADOT MVD) [Supplemental Appendix Item 2 to petitioner's opening brief]. Officer Kunde initially estimated that he had made 10-15 DUI arrests prior to his arrest of petitioner, however, he subsequently revised his estimate to approximately 20-30 DUI arrests. He also testified that his arrest of petitioner may have been his first DUI prescription drug arrest. [Id. p. 96, l. 16-19] Pursuant to A.R.S. § 28-1401(D), MVD did not delete from its records its three year revocation order of petitioner's driver license and privilege to drive, from October 18, 2010, to October 18, 2013. Petitioner was transported to the Peoria Police Department, Main Station, where she was contacted by Officer Privet, a phlebotomist. At 3:49 p.m., he opened a Tritech Forensic blood kit and removed the two empty glass vials inside, that he filled with petitioner's blood. Her blood sample in Vial No. 1 was for law enforcement testing and her blood sample in Vial No. 2 was for petitioner's testing by her independent expert. Petitioner was not initially charged with any civil or criminal traffic offense following her arrest. Officer Kunde then released petitioner without booking her and she was given a ride home by the police, because he believed that any charges against her – that might be filed after the DPS drug content test - would be filed in the Peoria City Court. [Id. p. 111, l. 19-25; p. 119, l. 23-120, l. 6]

1
2
3
4
5
6
7
8
9
10
11
12

Peoria Police Sergeant James Brown testified that he assisted Officer Kunde in his DUI investigation by conducting a collision investigation and preparing a collision report. He also conducted an inventory search of petitioner's SUV, prior to it being towed from the school, during which he found the envelope from Walgreens pharmacy for petitioner's clonazepam prescription that she had picked up earlier that day, which stated, "TAKE 1 TABLET BY MOUTH THREE TIMES DAILY AND 1 TABLET AT BEDTIME FOR SEVERE ANXIETY." [R.T. January 6, 2015, p.75]. On cross-examination, he testified that he prepared a one and-a-half page police report supplement that included his narrative of his involvement in the investigation. When petitioner's counsel informed the court that the state had failed to disclose to petitioner a copy of Sgt. Brown's supplement report, Comm. Richter excused the jury to consider the issue out of its presence.

13
14
15
16
17
18
19
20
21
22
23
24
25
26

DCA Serden provided petitioner with a copy of this report, which had hand-written notes at the bottom of page two. A copy of the report, including its hand-written notes, was marked for identification as Exhibit 29, and is included in the Appendix, to petitioner's opening brief as Item 2. DCA Serden stated that he had received the copy of the report from Officer Kunde during jury selection on the first day of trial. He further stated that Officer Kunde had used the bottom of page two as "scratch paper" and written on it, "Where did you get the knowledge to ask all the scientific questions?" He stated that he had responded to Officer Kunde's question by writing on the report, "Experience," followed by the number 2, which was circled, and then "a gift for bullshit" with the final word underscored numerous times. [Id. p. 12, l. 22; p. 15, l. 1] Petitioner then requested Comm. Richter to sanction the state for its violation of its duty to timely disclose the report by giving an oral jury instruction at that time, pursuant to Rule 105, Ariz.R.Evid., which Comm. Richter denied [Id. p. 15, l. 2; p.16, l. 17], at which time she stated:

27
28

> "I'll take the issue of any sanction for failure to provide a copy of Sergeant Brown's report under advisement. I don't think that an

22

instruction is necessary at this point in time. So, if you have a proposed final instruction that you would like me to give, we can consider that in final instructions. [Emphasis Supplied][Id. p.16, l.18-24]

Arizona Department of Public Safety (DPS) Crime Lab Criminalist Brandon Nabozny, performed a drug content test on petitioner's blood sample in Vial 1 and obtained test results of 94 ng/ml (nanograms of clonazepam per milliliter of blood). Criminalist Nabozny testified at petitioner's second trial that, with respect to the drug clonazepam – unlike ethanol – there is no general agreement in the scientific community that all persons above a certain level are impaired, at least to the slightest degree. [R.T. October 19, 2016, p. 146, l.21; p. 147, l. 16] He was not claiming that petitioner's clonazepam level in her blood sample was the true value because there certainly could be some variability in the accuracy of the measurement, which he referred to as the "level of certainty." [*Id*. p. 112, l. 9-12] It may have been his first analysis in which he had identified the drug clonazepam. [Id. p. 146, l. 6-14]

## GROUNDS FOR RELIEF

33.   Ground One: The State's Trial Counsel Committed Numerous Intentional Acts of Prosecutorial Misconduct, to Gain a Tactical Advantage, Which Included His Lack of Candor Toward the Tribunal, That When Combined, Violated Petitioner's Right to Due Process of Law.

Petitioner presented this argument on pages 29- 48 of her O.B., and on pages 11-32 of her R.B.

Petitioner presented this argument on pages 4-5 in her Petition for Review:

34.   **Petitioner Was Denied Due Process Based on Numerous acts of Prosecutorial Misconduct**

Petitioner began each of her arguments on this issue with the Arizona cases and other authorities, establishing the special responsibilities of a prosecutor, including her citation of the seminal Arizona cases *Pool v. Superior Court*, 139 Ariz. 98 (1984) and *State v. Roque*, 213 Ariz. 193 (2006).

The MD fails to address petitioner's prosecutorial misconduct argument regarding the state's "deliberate indifference and intentional ignorance" in its errors in charging petitioner with the same prescription drug DUI offense six times. The MD also fails to address her arguments on pages 13-14 of her RB, that the state's prosecutorial misconduct "could have affected" the jury's verdict (*State v. Jones*, 197 Ariz. 290 (2000)). Petitioner's argument was based on the fact that, following the mistrial declaration in her first trial, the ten members of the jury panel (which included two yet to be designated alternates) met with the parties' attorneys and informed them that seven of the jurors were "leaning" toward returning a verdict of not guilty and three of them were "leaning" toward returning a verdict of guilty.

### A.     The Special Responsibilities of a Prosecutor

On page 56 of petitioner's O.B., she included a quote from *Pool v. Superior Court*, 139 Ariz. 38 (1984), which was one of the cases she cited that established the special responsibilities of prosecutors, by which they are held to a higher standard of conduct than ordinary attorneys. The state waived this argument by failing to address it, and the authorities cited by petitioner, in its brief. The *Pool* court further stated on this issue:

> Even if the defense had been guilty of serious misconduct, the prosecutor would not have been entitled to engage in abusive, argumentative and harassing conduct. Our system represents a rule of law based upon the principle that officers of the law are bound by and must act within the law, even though the necessity of so doing may put them at a disadvantage in dealing with criminals or those accused of a crime. Any other system is a step which will inevitably lead us, as it has led others, to a society where the worst criminals are often those who govern and administer law. Thus, to paraphrase the words of Justice Sutherland, the prosecutor is not the representative of an ordinary litigant; he is a representative of a government whose obligation to govern fairly is as important as its obligation to govern at all. The prosecutor's interest in a criminal prosecution "is not that it shall win a case, but that justice shall be done." Thus, "while he may strike hard blows, he is not at liberty to strike foul ones." It is the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction just as it is his duty to use all proper methods to bring about a just conviction. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935). [Emphasis Supplied]

In petitioner's O.B., on pages 29-48, she specified numerous instances of intentional prosecutorial misconduct by the state's trial counsel, to gain a tactical advantage, which

24

included his lack of candor to the tribunal, that when combined, violated petitioner's right to due process of law. The state responds on page 8, citing *State v. Medina*, 232 Ariz. 391, 409 ¶ 76 (2013), claiming petitioner failed to object to the numerous acts of prosecutorial misconduct, and as a result, that petitioner's argument is only subject to fundamental error analysis by this court. In *Medina*, the defendant failed to make an objection in the trial court to the prosecutor's closing argument that he claimed on appeal was prosecutorial misconduct. *Medina* is not dispositive because petitioner objected to each of the separate acts of the prosecutorial misconduct by the state's trial counsel; however, some of her objections were made during the prosecutor's repeated acts of the same prosecutorial misconduct.

The state cites *United States v. Hasting*, 461 U.S. 499, 507 (1983), on page 9 of its brief, in which the Court stated that victims should not be forced "to relieve harrowing experiences now long past"[…]"merely" to chastise what the court view[s] as prosecutorial overreaching." However, *Hastings* is not dispositive since the charged offense of aggravated DUI, as stated by petitioner in footnote 8, on page 22 of her brief, "is a 'victimless' crime." Petitioner agrees with the state's statement on page 10 that prosecutorial misconduct therefore merits reversal only if it "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Burns*, 237 Ariz. 1, 31 ¶ 146 (2015). "The principle," in short, "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *State v. Jessen*, 130 Ariz. 1, 4 (1981)(internal ellipsis omitted.)

Petitioner agrees with the holding in *State v. Patterson*, 230 Ariz. 270, 275, p19 (2012), cited on page 12 of the state's brief, that an appellate court will not reverse a conviction based upon prosecutorial misconduct, unless "there is a reasonable likelihood it could have affected the jury's verdict and denied [the defendant] a fair trial." Petitioner has satisfied this standard based upon the fact that more than two thirds of the then ten trial jurors in petitioner's initial trial were "leaning" in favor of returning a verdict of not guilty at the time Comm. Richter declared a mistrial. In petitioner's double jeopardy motion, R.A.

25

1
2
3
4
5

70, and in her O.B. on page 46 - neither of which were disputed by the state – petitioner set forth the 7:3 split that the initial trial jurors disclosed to trial counsel in the jury room during their interview following Comm. Richter's mistrial declaration. This fact makes it clear that the subsequent prosecutorial misconduct by the state's trial counsel was intentional in order to decrease the possibility that the subsequent two juries would return not guilty verdicts.

6
7
8
9
10
11
12
13
14
15
16
17
18
19

On pages 11-13 of its brief, the state cites *Naupe v. Illinois*, 360 U.S. 264, 269 (1959) and *State v. Ferrari*, 112 Ariz. 324, 334 (1975), which cases petitioner also cited, on page 36 of her brief. These cases hold that a prosecutor's knowing use of perjured or false testimony is a denial of due process and is reversible error without the necessity of the defendant showing prejudice. The subsequent authorities cited by the state on this issue, hold that the defendant must show "a reasonable likelihood" that the false statement "could have affected" the jury's verdict. Petitioner has satisfied this burden by the uncontested fact that more than two-thirds of the ten then sitting jurors in petitioner's first trial were "leaning" in favor of returning a verdict of not guilty. The state, on page 11 in footnote 4 and on page 15, cites *State v. Jones*, 197 Ariz. 290, 305, p37 (2000), as authority for its argument that the current applicable standard for reversal of a conviction based upon prosecutorial misconduct is no longer "harmless beyond a reasonable doubt," as held in *State v. Roque*, 213 Ariz. 193, 228, p152 (2006). The language cited by appellee in *Jones*, states:

20
21
22
23
24
25
26

> Misconduct by the prosecutor during closing arguments may be grounds for reversal because he is a public servant whose primary interest is the pursuit of justice. *See Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). To determine whether a prosecutor's remarks are improper, [t]he trial court should consider (1) whether the remarks call to the attention of the jurors matters that they would not be justified in considering in determining their verdict, and (2) the probability that the jurors, under the circumstances of the particular case, were influenced by the remarks. Misconduct alone will not mandate that the defendant be awarded a new trial; such an award is only required when the defendant has been denied a fair trial as a result of the actions of counsel. The trial court is in the best position to determine whether an attorney's remarks require a mistrial, and its decision will not be disturbed absent a plain abuse of discretion.

27
28

*State v. Hansen*, 156 Ariz. 291, 296-97, 751 P.2d 951, 956-57 (1988) (citations omitted). Furthermore, prosecutors have wide latitude in presenting

26

their closing arguments to the jury: "excessive and emotional language is the bread and butter weapon of counsel's forensic arsenal, <u>limited by the principle that attorneys are not permitted to introduce or comment upon evidence which has not previously been offered and placed before the jury.</u>" [Citation Omitted] [Emphasis Supplied]

Petitioner did not cite *Jones* in her O.B., however, the above quote from it supports her claim that she is entitled to a reversal of her conviction based upon her prosecutorial misconduct argument.

**B.    The state willfully engaged in prosecutorial misconduct, by which it gained a tactical advantage, through its deliberate indifference and intentional ignorance of its repeated errors during its three prior grand jury presentations against petitioner.**

On pages 31-33 of her O.B., petitioner argued the prejudice she suffered as a result of the increase of the cost, length, and burden of litigation with little or no corresponding benefit resulting from the trial prosecutor's deliberate indifference and intentional ignorance of his repeated errors during the three grand jury presentations against petitioner, all of which required remand. The state responds on pages 14-15, which the state's appellate counsel describes as a "*challenge to unspecified 'errors' during grand jury proceedings.*" The state further complains "But petitioner does not explain what these 'errors' were," and, ". . .the state cannot intelligently respond to an argument alleging unspecified errors in unspecified portions of the record."    Petitioner did in fact explain in her brief both the nature of the prosecutorial misconduct with appropriate references to the record. In footnote 1 on page 7 and on page 32 of her brief, petitioner explained that all of the trial prosecutor's grand jury misconduct, that resulted in the grand jury remand orders being entered in the three cases in which she was previously charged by way of indictment, as well as the five other cases in which other defendants charged with the same offense were granted grand jury remand orders, were a result of the fact that during each grand jury presentation, the prosecutor attending the grand jury proceeding failed to instruct the grand jurors on **all** applicable law, including the non-statutory *State v. Williams,* 144 Ariz. 487 (1985) element of the charged offense. This prosecutorial misconduct by the state's grand jury counsel was also explained by petitioner in the documents which were the subject of petitioner's motion

for this court to take judicial notice of the state's other cases in which it charged petitioner with the same offense, that was granted by Judge Pro Tem Anthony Mackey on May 12, 2017. Therefore, the state's assertion that it "[C]annot intelligently respond to an argument alleging unspecified errors in unspecified portions of the record" is without merit. The state's appellate counsel did in fact acknowledge his understanding of the basis for all of these remand orders, on page 79 of his brief, by his statement, "To prove that charge, '[t]he State must show that the driver knew or should have known that the license has been suspended,' revoked, or restricted." *State v. Williams,* 144 Ariz. 487 (1985).

+ + +

C.    **Prosecutorial misconduct which included a lack of candor toward the tribunal during petitioner's second trial, by making numerous intentional misstatements of fact and law and, during her third trial, by making a frivolous motion to Call Petitioner's Co-Counsel As a Witness For the State**

**The State's Trial counsel violated his Duty of Candor Toward the Tribunal by His Intentional Misstatements**

Petitioner supplements this argument with the following legal authorities:

+ + +

The principles that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness. The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend. As stated by the New York Court of Appeals in a case very similar to this one, [citation omitted].

'It is of no consequence that the falsehood bore upon the witness' credibility rather than directly upon defendant's guilt. A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth. *** That the district attorney's silence was not the result of guile or a desire to prejudice matters little, for its impact was the same, preventing, as it did, a trial that could in any real sense be termed fair.'

On page 29 of the state's brief, it includes a portion of the opening statement made by its trial prosecutor on October 18, 2016, during petitioner's second jury trial. However, the omitted portions before and after the quoted portions of the state's trial counsel's

28

opening statement unfairly present and do not present the true context of the statement. The omitted portions are as follows:

[In Deputy County Attorney [DCA] Richard Serden's opening statement, he included a summary of the evidence that he intended to present against petitioner at trial and a review of the applicable law. He then stated:] Now I've given you all of the State's good news.[8]

Now I'm going to give you the State's bad news. When blood was drawn, two vials of the blood were drawn, and the DPS lab tested one of the vials. The kit was then sent back to Peoria Police Department for storage. For several reasons that are really not germane to what's going on here, the case against the Defendant was filed, dismissed, filed, dismissed, and then refiled. During one of those filings, dismissals, and refilings, a notice was sent to Peoria Police Department that the case was over. It was called a disposition notice.

As a result of that disposition notice, in September of 2014, the Peoria Police Department destroyed the kit. So about three years after the incident - - for three years the kit was available to be tested. But after that, the Defense requested that they be able to retest the blood, and it was discovered that the kit was no longer available. So that is the bad news, from the State's perspective.

On page 32 of its brief, the state argues, "Even assuming the prosecutor misstated the number of times the case had been filed, it was clearly an innocent mistake." [Emphasis Supplied].

The state's "innocent mistake" argument is refuted by the fact that on October 24, 2016, respondent specifically objected to the intentional misstatement made during the state's trial counsel's opening statement [R.T. 10/24/16 p.70-71]. Also, as petitioner stated, on page 37 of her brief, the state's trial counsel exacerbated his initial prosecutorial misconduct by refusing the request of petitioner's co-counsel, Lawrence Koplow, to inform the jury of his false statement in his opening statement. This conduct is even more reprehensible in light of the fact that, although the state's trial counsel stated, "I will correct it in front of the jury then," he never fulfilled his promise that he made in open court, out of the presence of the jury.

---

[8] In the state's brief, on pages 53-54 and 90-98, it argues against petitioner's prosecutorial misconduct and the trial court's reversible error arguments, respectively, that "the defense had no legal entitlement to the second vial of blood." The concession by the state's trial counsel in his opening statement of the "good news/bad news" contradicts this argument.

1

2

**D.     Prosecutorial misconduct during his rebuttal closing argument in petitioner's second jury trial, when he made repeated disparaging comments directed at petitioner's counsel.**

3

4

5

6

7

8

9

10

11

12

13

14

Although the state waived petitioner's argument regarding the special responsibility of prosecutors, by which they are held to a higher standard than ordinary attorneys, it argues on page 33 of its brief that the fact that its trial prosecutor intentionally misstated to the jury during his opening statement in petitioner's second jury trial, that petitioner had been prosecuted three times instead of six times did not prejudice petitioner because the exact number of times the state re-prosecuted respondent as a result of its numerous charging errors, was immaterial. However, on the same page, the state concedes, "[I]t was **relevant** that the case was filed more than once – it explained while [sic] the blood vial was destroyed," however the state then argues, "[T]he fact that the case was filed *exactly six* times was immaterial." This statement by the state reflects its misunderstanding of the requirement of relevancy and materiality, both of which concepts are included in Rule 401, Ariz.R.Evid., which states:

15

16

17

> Evidence is relevant if:
> (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and
> (b) The fact is of consequence in determining the action[9].

18

19

20

21

22

Finally, the state's implication that, in spite of its trial prosecutor's intentional misstatement to the jury about the number of times it had prosecuted petitioner, such misstatement was not prosecutorial misconduct because it was "O.K. for him to lie to the jury" about a marginally relevant matter, is without merit. Also, it certainly did not comply with the heightened standard required of prosecutors.

23

24

On pages 35-41, the state responds to petitioner's argument that its trial prosecutor had committed prosecutorial misconduct when he incorrectly stated to the jury, during his

25

26

27

28

[9] *The Arizona Law of Evidence, Volume 1, Revised Fourth Edition*, by the late Daniel J. McAuliffe and Shirley J. (Wahl) McAuliffe, states on page 104, Section 401: 2, "The central concept in the law of evidence is that of relevance. Rule 401 combines in one term what were formerly treated as the two distinct concepts of materiality and relevancy. Materiality was an inquiry into whether the offered evidence was addressed to an issue in the case. The issues in the case are, of course, controlled by the pleadings and the substantive law. [citation omitted] Materiality is captured in Rule 401 by requiring, in order to demonstrate relevance, that the fact sought to be proved be "of consequence to the determination of the action." [citation omitted]

rebuttal closing argument, that petitioner had stipulated to the reason her second blood vial had been destroyed. The state claims that there are two reasons for the rejection of this argument. First, the state claims that peitioner failed to support the argument with adequate citation to the record. On page 39 of her brief, petitioner stated that the state's trial counsel specifically stated, "The parties agreed prior to this being submitted to you that that's what happened […] now the defense is arguing that it's proof of some great conspiracy." [R.T. 10/26/16, p. 70] Second, the record supports petitioner's continuing objection to the state's trial counsel's misstatement regarding the purported stipulation. Petitioner immediately prior to the state's trial counsel's misstatement that petitioner had entered into a stipulation regarding the destruction of her blood sample, Comm. Richter had ordered both of petitioner's co-counsel to refrain from making further objections during the state's trial counsel's rebuttal argument, at which time the following proceedings occurred:

> MR. KOPLOW: Your Honor, could we have a sidebar, please? Please?"
> MR. COFFINGER: We can't - -
> THE COURT: <u>No sidebar. Objection's overruled</u>. This is argument. <u>Please allow Mr. Serden to make his argument</u>.
> MR. KOPLOW: Your Honor, you're not allowed to misstate the law. This is a misstatement of the law.
> THE COURT: Mr. Koplow, I understand you disagree. <u>Your objection's overruled</u>. [Emphasis Supplied]

The state concedes on page 37-38 of its brief, "Defense counsel refused [to accept the state's proposed stipulation regarding the destruction of petitioner's blood sample] because he wanted the prosecutor to testify about 'how do you issue these things, when do you issue these things, what part of your staff is involved in it, how does it get so it says approved by Aaron Harder, did you show it to him, how does that happen? *Id.* 6-7."

On page 51 of its brief, the state cites *State v. Ramos*, 235 Ariz. 230, 238, p25 (App.Div.1-2014), in support of its argument that its trial prosecutor did not commit prosecutorial misconduct during his rebuttal argument, by stating defense counsel attempted to "distract" or "deflect" the jury's attention. However, the cited language from *Ramos* supports petitioner's argument, stating:

> Jury argument that impugns the integrity or honesty of opposing counsel is [ ] improper," *State v. Hughes*, 193 Ariz. 72, 86 ¶59, 969 P.2d

1184, 1198 (1998), but "[c]riticism of defense theories and tactics is a
proper subject of closing argument," *U.S. v. Sayetsitty*, 107 F.3d 1405,
1409 (9th Cir.1997). Although some of the prosecutor's comments
suggested that defense counsel was attempting to mislead the jury, we
cannot say that those statements did more than criticize defense tactics.

Ramos was charged with operating a "chop shop" and theft of means of

transportation. . .Like petitioner, he argued that the prosecutor improperly impugned his

defense counsel during rebuttal argument. He argued as follows:

> [T]he prosecutor claimed that defense counsel's focus on the State's failure
> to prove Ramos owned the property upon which the trailer and stripped
> vehicle were found was an attempt to diver the jurors from the relevant
> evidence by raising distractions or "red herrings." The prosecutor also told
> jurors that defense counsel asked them to speculate and "check [their]
> common sense at the door."

On pages 41-43 of petitioner's brief, she set forth the five separate disparaging

comments against her counsel, all of which were objected to by petitioner, made by the

state's trial prosecutor during his rebuttal argument were obviously more egregious than the

two comments made in Ramos.

**Prosecutorial misconduct during the state's rebuttal closing argument
in petitioner's second jury trial by knowingly making an incorrect
statement of law.**

On pages 53-54 of the state's brief, it argues that its trial prosecutor did not

knowingly make "an incorrect statement of the law" when he argued that "there was no

'legal' requirement for the State to preserve a second vial of blood for the defendant." The

state further argues on page 54 of its brief,

> "But regardless is explained in part VI, *infra*, [pages 90-98] the
> prosecutor's argument accurately stated the governing law." These
> assertions by the state's portion of its brief conflict with its trial
> prosecutor's "good news/bad news" concession in his opening statement
> previously cited as well as his reference to the "good news/bad news" in
> his rebuttal closing argument, when he states:
> I'll agree this doesn't look good for the State […] I'm gonna create this
> nightmare for myself intentionally? […] It was an inadvertent disposal […]
> but, again they are not entitled to that. [R.T. 10/26/16 p. 70-71]

In *Nesci's Arizona DUI Defense: The Law and Practice*, Fourth Edition, Lawyers &

Judges Publishing, Inc., 2015, by Tucson, Arizona attorney James Nesci, the author includes

the following scholarly discussion of this issue, which includes citation of numerous

reported Arizona appellate court opinions, in which the state – as it has done again in this

case – sought Arizona's appellate courts to abandon the heightened due process standard in

DUI cases that has been the law in Arizona for nearly 50 years, stating:

> When the issue of the denial of the right to an independent test arises, the state usually tries to hide behind A.R.S §28-1381(M), which states that the suspect shall be given a reasonable opportunity to arrange for an independent test in addition to the law enforcement blood test. The last sentence reads: "The failure or inability to obtain an additional test by a person does not preclude the admission of evidence relating to the test or tests taken at the direction of a law enforcement officer." Subsection M is directed at those defendants who simply choose not to obtain an independent test – not at those defendants who are prevented from obtaining the independent test.

> ***

> Under the Arizona and the U.S. Constitution the requirements of due process in DUI cases provide for two separate protections in order to afford the accused a meaningful opportunity to present a defense.

> First, a person must be given a reasonably reliable sample of the evidence tested by the state in order to attack the validity of the test reading and hence the presumption of intoxication. *State v. Velasco*, 165 Ariz. 480 (1990); *State v. Harrison*, 157 Ariz. 184 (App.1988); *Baca v. Smith*, 124 Ariz. 353 (1979); *Scales v. City Court of Mesa*, 122 Ariz. 231 (1970).

> Second, the due process clause requires the state to provide a fair chance to the accused to gather evidence of her innocence by informing the accused of her right to an independent test. *Montaño v. Superior Court*, 149 Ariz. 385 (1986).

> The Arizona Supreme Court has never waivered in its resolve in mandating these protections, even against constant urging by the state to vacate these protections based on *California v. Trombetta*, 467 U.S. 479, 104 S.Ct. 2528 (1984). See, for example, *Oshrin v. Coulter*, 142 Ariz. 109 (1984); *Montaño v. Superior Court, supra* (separate guarantee of due process clause of Arizona Constitution require preservation even in light of *Trombetta*: "Due Process would be offended if, under the aegis of implied consent, we grant to the state a monopoly over objective means of proof").

> In *Amos v. Bowen, supra*, and *McNutt v. Superior Court*, 133 Ariz. 7 (1982), the Supreme Court dismissed both cases since the defendants were not afforded an opportunity to obtain an independent blood test within two hours of driving. The delay of over two hours made the test of little or no evidentiary value. In *Amos*, [143 Ariz. 324 (1984) dismissal was mandated even though the delay by the arresting officer was unavoidable and unintentional. [Emphasis Supplied]

On pages 58-59, the state argues that petitioner's claim of prejudice as a result of the

trial prosecutor's numerous acts of prosecutorial misconduct "does not hold water" even

though it concedes that the prosecutor knew that "more than two thirds of the jurors in

1  petitioner's first trial" were inclined to acquit." In light of this concession, the state provides

2  no sound basis in opposition to petitioner's argument that the state's trial counsel's

3  prosecutorial misconduct was intentional. However, petitioner agrees with the state's

4  statement, on page 59:

5      Ethical attorneys routinely resist the temptation to gain illegitimate
       advantages at trial […]"

6  Unfortunately for petitioner, her trial prosecutor did not resist this temptation.

7

8  35.   Petitioner submits the following federal court authority in accord with the authorities

9      Petitioner has previously submitted herein in support of this argument:

10         These cases . . . illustrate the special role played by the American
           prosecutor in the search for truth in criminal trials. Within the federal
11         system, for example, we have said that the United States Attorney is "the
           representative not of an ordinary party to a controversy, but of a sovereignty
12         whose obligation to govern impartially is as compelling as its obligation to
           govern at all; and whose interest, therefore, in a criminal prosecution is not
13         that it shall win a case, but that justice shall be done." Berger v. United
           States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).
14

15     Strickler v. Greene, 527 U.S. 263, 281 (1999)

16  36.   Petitioner adopts the following portion of the "Factual and Procedural Background,"

17     from paragraphs 2-5 of the court of appeals' Memorandum Decision, supplemented

18     by petitioner's additions in brackets:

19     ¶2 In the afternoon of August 18, 2011, Michelle Murphy waited in her parked car
       to pick up her daughter from school. Espinosa was also parked in the lane of waiting
20     cars and was five or six feet directly in front of Murphy. After a few minutes,
       Espinosa's vehicle rolled backwards and collided with Murphy's car. Murphy exited
21     her vehicle to check on Espinosa who appeared "dazed" and responded negatively
       to Murphy's stated intent to call the police. Before arriving at the school, Murphy
22     had observed Espinosa driving erratically.

23     ¶3 Another parent contacted police officer Kunde who was nearby, and Kunde
       responded to the scene. As the officer talked with Espinosa through her open driver
24     side window, he noticed an ignition interlock device near the middle console, and
       Espinosa's vehicle rolled forward and backward a couple times before Kunde
25     directed her to park in the school's driveway. As she pulled away, Espinosa drove
       over the curb before coming to a stop. When Espinosa exited her vehicle to look for
26     her driver license and registration in the back of the vehicle, she was "very unstable
       on her feet" and "wobbling[.]" Espinosa informed Kunde that she had not been
27     drinking, but she had taken three doses of her prescribed clonazepam earlier that day.
       She did not find her license, which the state subsequently learned was revoked and
28     subject ot a number of restrictions.

                                        34

1    A.R.S. §§ 28-1401 and 28-1402 authorize the Arizona Department of Transportation

2    ("ADOT") - Motor Vehicle Division ("MVD") to issue a "Special Ignition Interlock

3    Restricted Driver License" ("SIIRDL") to a licensee whose driver license has either been

4    suspended or revoked for various MVD ordered DUI related corrective actions.  One such

5    DUI related corrective action for which MVD was authorized by these statutes to issue a

6    licensee a SIIRDL was a three year driver license revocation that ADOT-MVD entered

7    against petitioner for her 2009 aggravated DUI (intoxicating liquor - child under age 14 in

8    the vehicle) conviction.  A.R.S. §28-1402 includes the destination restrictions applicable to

9    SIIRDLs.  ADOT-MVD Driver Improvement/Records Custodian Wayne Ruiz testified in

10   both petitioner's first and second jury trials that a licensee with a SIIRDL, like petitioner,

11   was allowed to drive – to the restricted destinations authorized in A.R.S. §28-1402 – during

12   the remainder of her three year revocation period.    The certified ignition interlock

13   requirement of petitioner's SIIRDL was imposed upon petitioner by her action of obtaining

14   it and therefore it was not imposed upon her by either the court or MVD.  A court or MVD

15   ordered certified ignition interlock is a requirement of the aggravated DUI offense for which

16   she was convicted, namely a violation of A.R.S. §28-1383(a)(1).  A SIIRDL is distinct from

17   the statutory requirement that, once the revocation period is completed, such licensees like

18   petitioner were required by MVD to maintain a certified ignition interlock device in a

19   vehicle for two additional years.

20   Clonazepam is a benzodiazepine prescribed to treat seizures, anxiety, and

21   sleeplessness.  Dorland's Illustrated Medical Dictionary 329 (25th ed. 1974).

23   ¶4 Kunde administered field sobriety tests, and Espinosa exhibited numerous
     signs of impairment.  A horizontal gaze nystagmus test revealed six out of six
     clues of possible neurological impairment.  Kunde arrested Espinosa, and
24   after reading her the "admin per se implied consent" form, a phlebotomist
     also advised Espinosa of her right to an independent blood test.  The state's
25   testing of one of the blood vials [by DPS Criminalist Brandon Nabozny
     indicated 94 nanograms of clonazepam per milliliter of blood] an amount of
26   clonazepam approximately twice the upper limit of the therapeutic range.
     [This statement in the MD is incomplete because Criminalist Nabozny also
27   testified, after reviewing a transcript of his prior testimony in the Peoria City
     Court, at an evidentiary hearing in the initial prosecution filed by the state
28   against petitioner, that the therapeutic range for clonazepam was from 20 to

35

**70** nanograms per milliliter of blood based on the peer reviewed report of the International Association of Forensic toxicology.] [RT 10-19-16 p. 126, 1.1.-p. 127, 1.16.] Arguing the warrantless blood draw was not consensual, Espinosa unsuccessfully moved to suppress the blood test results.

¶5 Criminal charges against Espinosa were filed, dismissed, and refiled a number of times. In 2014, after one of the dismissals, the police department destroyed the second vial of Espinosa's blood, which resulted in Espinosa's inability to independently test the blood after she requested to do so in 2016. Espinosa unsuccessfully moved to dismiss - or alternatively to suppress the blood test results - on the purported basis that the state's failure to preserve the second vial violated her due process rights.

[Emphasis supplied]

DPS Criminalist Nabozny also testified at petitioner's second trial that, with respect to the drug clonazepam a level above the scientifically accepted therapeutic level, is not evidence of a person's impairment from the drug, especially if the person has developed a tolerance to it from long term usage. [R.T. October 19, 2016, p. 146, 1.21; p. 147, 1.16]

37.   Ground Two: The Superior Court Committed Reversible Error by Denying Petitioner Motion to Strike the State's Sentencing Enhancement Allegation That She Committed the Charged Offense While On Probation For a Prior Felony Offense Because Her Prior Class 6 Undesignated Aggravated DUI Offenses Were Designated as Misdemeanors Prior to the Date (1) the State Filed the Charge, and (2) the State Filed Its Allegation.

Petitioner presented this argument on pages 49-51 of her O.B. and on page 37-39 of her R.B.

Petitioner presented this argument on pages 5-7 in her Petition for Review:

A.R.S. § 13-105(18) states:

In this title, unless the context otherwise requires: […]

(18) "Felony" means an offense for which a sentence to a term of imprisonment in the custody of the state department of corrections is authorized by any law of the state.

Based upon this definition, once petitioner's undesignated Class 6 offenses were designated as misdemeanors, they could no longer be treated as "felony" offenses because following misdemeanor designation, the offenses were no longer offenses "for which a sentence to a term of imprisonment in the custody of the state department of corrections is authorized by any law of this state."

36

1
2
3
4
5
6
7

In petitioner's O.B., on page 50, she cited [the Div. 1 Court of Appeals] memorandum decision in *State of Arizona v. Dawn Michelle Knapp*, No. 1 CA-CR 10-0787 [Appendix Exhibit Q], filed October 20, 2011. Petitioner stated that the reason she cited the *Knapp* memorandum decision was "to assist the appellate court in deciding whether to issue a published opinion" in her case and alternatively, as required by Arizona Supreme Court Rule 111, petitioner provided a hyperlink to the decision. Petitioner's modified O.B. further stated:

8
9
10
11

> [Rule 111 of the Arizona Supreme Court Rules] provides a list of factors which this court must consider when deciding whether to issue a published opinion. These include whether the decision [e]stablishes, alters, modifies or clarifies a rule of law," whether is "[c]alls attention to a rule of law which appears to have been generally overlooked," whether it "[c]riticizes existing law," and whether it "[i]nvolves a legal or factual issue of unique interest or substantial public importance[.]...

12
13

In the state's Motion to Strike [petitioner's] Second O.B., filed September 6, 2017, which was denied, the state states on page 3:

14
15
16

> ...while Petitioner now lists the four factors which this Court must consider when deciding whether to issue a published opinion under Ariz. Sup. Ct. R. 111(b), she does not analyze the factors or explain why publication would be appropriate in this case. (O.B. at 50-51)

17
18
19
20
21
22
23
24
25
26
27
28

The issue presented in the *Knapp* decision is of profound importance to the bench and bar that have had to repeatedly deal with determining whether a prior Class 6 undesignated offense may be treated as a sentence enhancement felony conviction when the offense was designated a misdemeanor after the date of the defendant's alleged commission of the subsequent offense but prior to the sentencing in the subsequent case. In petitioner's case, the superior court agreed with the state that petitioner could be subjected to a mandatory sentencing enhancement for the commission of the present offense while on felony probation, pursuant to A.R.S. § 13-708(A), even though her prior offense had been designated a misdemeanor (1) prior to the state's filing of the present charge, (2) and prior to the state's filing of its sentence enhancement allegation, and (3) prior to petitioner's sentencing in the subsequent case. Div. 1 of the Arizona Court of Appeals, in the *Knapp* memorandum decision, ruled that the superior court committed reversible error in

sentencing the defendant under the similar sentence enhancement allegation of having been convicted of a historical prior felony because Knapp's prior Class 6 undesignated offense had been designated a misdemeanor prior to her conviction in her subsequent case. In light of the limitation of citing memorandum decisions provided in Supreme Court Rule 111, petitioner was unable to cite the *Knapp* memorandum decision to Comm. Richter. The importance of this issue, which has not yet been resolved in Arizona in a published opinion, provide[d] [a] strong basis for the court of appeals to issue a published opinion in [in petitioner's direct appeal]. Such an opinion would preclude the state from ever again filing a sentence enhancement allegation based on a defendant's prior Class 6 undesignated conviction in a subsequent prosecution, if the prior offense was designated a Class 1 misdemeanor after the date of the commission of the subsequent offense but prior to the filing of the sentence enhancement allegation in the subsequent offense.

The June 2006 issue of the *Arizona Attorney* magazine, (Volume 42, Number 10), included several articles on memorandum decisions. The first article was entitled, "The Secret History of Memo Decisions." It was co-authored by retired Arizona Court of Appeals, Division One, Judge, the Hon. Donn G. Kessler, and by Thomas L. Hudson, Esq., of the law firm of Osborne Maledon PA, These co-authors provided respective "con" and "pro" positions on the then proposed amendment to Arizona Supreme Court Rule 111 that would allow citation of memorandum decisions as persuasive but not controlling. The second article, was written by Richard D. Coffinger, one of petitioner's undersigned co-counsel, entitled, "Does the Honor System Separate the Wheat From the Chaff?"

Mr. Hudson's "pro" article on the subject began as follows:

While conducting research in connection with a somewhat novel issue, <u>you are unable to find any published decision on point, but you stumble across a memorandum decision from the Arizona Court of Appeals that squarely addresses your issue. What do you do? You would like to tell the judge about the decision. Your client would like you to tell the judge about it. The judge would even like you to tell her about it. But Arizona's current rules concerning the citation of memoranda decisions – among the strictest in the nation – flatly prohibit you from mentioning the case to the judge.</u> [Footnote omitted] [Emphasis Supplied]

Petitioner's undersigned co-counsel experienced the precise frustration described by Mr. Hudson in his hypothetical, because he was unable to cite the court of appeals *Knapp* memorandum decision to Comm. Richter. However, thankfully, due to the Arizona Supreme Court's amendment to Rule 111, Petitioner [was] permitted to cite it to the court of appeals, "to assist the appellate court in deciding whether to issue a published opinion."

Since the *Knapp* court resolved an issue of first impression in Arizona, petitioner argues that the court's ruling should have been by way of a published opinion rather than a memorandum decision.

Petitioner's undersigned co-counsel Mr. Coffinger addressed this precise issue in his article, which begins as follows:

…Does the published opinion rule based on the honor system effectively separate the wheat from the chaff?

**The Published Opinion Rule**

In 1985, the Supreme Court rule was renumbered as current Rule 111. It states in part:

**(b) When disposition to be by opinion.** *Dispositions of matters before the court requiring a written decision shall be by written opinion when a majority of the judges acting determine that it:*

1. *Establishes*, alters, modifies, *or clarifies a rule of law,* or

2. Calls attention to a rule of law which appears to have been generally overlooked, or

3. Criticizes existing law, or

4. Involves a legal or factual issue of unique interest or substantial public importance, or if the disposition of matter is accompanied by a separate concurring or dissenting expression, and the author of such separate expression desires that it be published, then the decision shall be by opinion. [Emphasis Supplied]

Because an appellate court's disposition of all matters presenting an issue of first impression *a fortiori* "establishes…a rule of law," all such dispositions should be by a published opinion. Every appellate court disposition that reverses the judgment, order or decision of a lower court or agency *a fortiori*, clarifies a rule of law.

In spite of the clear mandate of the rule, currently many such cases are resolved in memorandum decisions. The appellate judges are on the honor system to follow the rule, and the workload considerations described by Judge

1
2
3

Kessler can make it difficult for even the most conscientious judge to commit the extra time and effort necessary to write a published opinion in such cases. He or she could simply rationalize that, although the case presents an issue of first impression, it is not important enough to be published, in spite of the rules mandate. [Emphasis Supplied]

4   On page 62-63 of its brief, the state presents its "backward-looking" "forward-

5   looking" argument that the court should adopt separate standards for whether a person is

6   convicted of a "felony" for sentence enhancement purposes, depending upon whether the

7   state is seeking sentence enhancement for a felony pursuant to A.R.S. §§ 13-708(C) or

8   604(A). Statutes relating to the same subject matter should be read *in pari materia,* to

9   determine legislative    *See Golder v. Arizona Dept. of Transp., Motor Vehicle Div.*, 170

10  Ariz. 414, 416 (1993) *Lucille v. Dodge*, 197 Ariz. 591, 596 p13 (App.Div.1-   )

11  On page 107 of its brief, the state cites the civil, tort motor vehicle case of *Franklin*

12  *v. Clemett*, 240 Ariz. 587, ¶26 (App.Div.1, 2016), in response to petitioner's sub-argument

13  in Argument VII, that the trial court committed reversible error by denying respondent's

14  requested jury instruction on the meaning of the term "under the influence." The state's

15  proposal for this court to establish separate meanings for the term "felony conviction" as

16  used in the various aggravating circumstance sentence enhancement statutes, depending

17  upon whether it is "backward looking" or "forward looking," violates the *Franklin* holding

18  that the plaintiff "has not demonstrated that this common understanding [of the meaning of

19  the word or phrase at issue] differs depending on its context." The state's argument based

20  on *State v. Barr*, 217 Ariz. 445 (App.Div.1, 2008), is also without merit. In *Barr*, the

21  defendant was convicted of child molestation by furnishing harmful items to a minor. The

22  *Barr* court stated:

23
24
25
26
27
28

Barr also asserts that he should be granted relief because the offense that is the subject of his 1993 conviction was subsequently reduced to a misdemeanor. The order designating the offense as a misdemeanor was entered on May 5, 2006. Pursuant to A.R.S. 13-702(G)(Supp.2006), an undesignated offense "shall be treated as a felony for all purposes until such time as the court may actually enter an order designating the offense a misdemeanor." Consequently, the trial court was correct in treating Barr's 1993 conviction as a felony for sentencing purposes when imposing sentence in the instant case on March 16, 2006. [Footnote Omitted] [Emphasis Supplied]

1
2
3

Unlike the defendant in *Barr, supra*, whose misdemeanor designation did not occur until *after* he was sentenced for his subsequent conviction, petitioner's misdemeanor designation occurred *before* she was sentenced for her subsequent conviction.

4
5

**Error Based on Date of Offense Rather than Date of Misdemeanor Designation of Prior Undesignated Offenses**

6
7
8

[The MD states in ¶**19.** […] [Espinosa has waived (her argument) that the superior court erred by denying her motion to strike the state's sentence enhancement allegation] because she provides no citation to the record to support her factual assertion [that her prior aggravated DUI convictions had been designated misdemeanors before the state filed the current charge.]

9

***

10
11

[…] absent anything in the record indicating the contrary, which Espinosa does not provide […]

12
13
14
15

These statements in the MD are erroneous. Petitioner included the reference to her motion to strike in her OB on pages 12-13 as **R.A. Item 23**. Her motion included copies of Comm. Phemonia Miller's April 23, 2012, orders designating both of her prior related aggravated DUI undesignated offenses as misdemeanors. The MD then erroneously holds:

16
17

**¶19** […] the applicable date for determining the proper designation of her prior felony conviction is the date of the offense in this case, not the date the state filed the charges or the sentence enhancement allegation. [Emphasis Supplied]

18
19
20

In petitioner's O.B., on page 50, she cites the memorandum decision (Appendix Exhibit Q) in *State of Arizona v. Dawn Michelle Knapp*, No. 1 CA-CR 10-0787, (2011). The MD's holding on this issue directly conflicts with the *Knapp* MD, which states:

21
22
23
24
25
26

**¶9** […] because her prior conviction for the 2005 offense was designated a misdemeanor before the conviction for the 2009 offense, she did not hav[e] a historical prior felony conviction. *See* A.R.S. 13-604(A)("The [undesignated] offense shall be treated for all purposes as a felony *until* such time as the court may actually enter an order designating the offense as a misdemeanor." [Emphasis Added]). […] *see also In re Beren*, 178 Ariz. 400, 402 ( …1994)(acknowledging that our supreme court has previously held "that an open-end conviction is deemed a felony conviction for criminal sentencing considerations until the court designates the offense as a misdemeanor." [citations omitted]). [Emphasis supplied]

27
28

1     The statutory definition of a "felony" [sic] [is] provided is A.R.S. § 13-105(18),

2   which respondent cited in her RB, on page 33. The MD neither cites this statute nor the

3   *Knapp* MD. In spite of respondent's emphasis on the need for a published opinion to resolve

4   the conflict with *Knapp,* the MD concludes with the court's unexplained statement, "We

5   decline [Espinosa's] invitation to publish this decision as an opinion."

6   38.    Ground Three: The Superior Court Committed Reversible Error by Denying
              Petitioner's (1) Motion for Dismissal, With Prejudice, Based Upon the
7             Superior Court's *Sua Sponte* Mistrial Declaration, Without Either a Manifest
              Necessity or Petitioner's Consent, and (2) Motion for Directed Verdict of
8             Acquittal, Pursuant to Rule 20, Ariz.R.Crim.Pro,, That She Made In Her
              Second Trial After the State Rested Its Case-in-Chief.
9

10      Petitioner presented this argument on pages 51-65 of her O.B. and on pages 40-42

11  of her R.B.

12      Petitioner presented this argument on pages 7-9 in her Petition for Review:

13  Part 1: The Superior Court Committed Reversible Error by Denying Petitioner's Motion for
          Dismissal, With Prejudice, Based Upon the Superior Court's *Sua Sponte* Mistrial
14        Declaration

15  A.   Supporting Facts for Ground Three-Part 1

16  39.    Petitioner adopts the following portion of the "Factual and Procedural Background,"

17  from paragraph 6 of the court of appeals' memorandum decision, supplemented by additions

18  in brackets:

19          ¶6 The matter proceeded to jury trial to determine Espinosa's guilt as to one
         count of aggravated DUI based on an allegation that her driver licence was
20       revoked or restricted at the time of the 2011 offense due to a prior DUI
         conviction.  Espinosa testified on cross-examination that, based on her trial
21       attorney's advise before the incident, she did not know her driving privileges
         were restricted beyond the requirement that an ignition interlock device be
22       installed in her vehicle.  *See* Ariz. Rev. Stat. (A.R.S.) § 28-1402(A) (2012)
         (Driver's child's school not listed among places between which a driver with
23       a SIIRDL is allowed to drive).  Given this testimony, the state informed the
         court that it intended to call Espinosa's attorney as a witness.  Finding it
24       would be "appropriate that the State be allowed" to do so, the court addressed
         Espinosa and noted: "[G]iven that situation, obviously, we can't proceed with
25       [defense counsel] being both your lawyer and witness in your case."
         Accordingly, the court declared a mistrial and denied Espinosa's request that
26       the case be dismissed with prejudice Espinosa sough special action relief in
         this court.  We declined jurisdiction, and the supreme court denied review.
27       Re-trial commenced in October 2016.

28

1    Petitioner presented the following argument in both her Special Action and her O.B.,

2    R.B. and Petition for Review.

3    On January 8, 2015, the third day of trial in petitioner's first jury trial, the State's

4    final witness, Wayne Ruiz, a MVD custodian of the records, testified that (1) petitioner's

5    SIIRDL allowed her to lawfully drive on the date of the alleged offense, in spite of her three

6    year revocation, and (2) MVD had not provided petitioner with any written notice of the

7    SIIRDL destination restrictions provided in A.R.S. §28-1402 [Reporter's Transcript (RT),

8    1/8/14, p. 32].

9

10   Petitioner testified in her own defense on direct examination, that she never received

11   any notice of any SIIRDL destination restrictions, and that she was unaware of such

12   restrictions on the date of the alleged offense [RT 1/8/15 p. 40].  On cross-examination, she

13   testified as follows:

14       Q. [by Deputy County Attorney (DCA) Richard Serden] Did you
         ask Mr. Coffinger whether there were additional restriction under
15       ARS 28-1402?

16       A. No, I didn't.

17       Q. Did you think it incumbent upon yourself to go find out what
         restrictions were under ARS 28-1402?

18
         A. I'm sorry I didn't.  I called Mr. Coffinger and I felt he explained it to
19       me fully.

20       Q. Did you ask him–... what ARS 28-1402 says?

21       A. I never said anything about ARS.  When it says restricted
         interlock, that tells me you are restricted.  You just have to have an
22       interlock. [Emphasis supplied] [RT 1/8/15 p. 53]

23   DCA Serden then projected a copy of A.R.S. §28-1402 onto a screen, and asked

24   petitioner to read to the jury some of its provisions, at which time the following proceedings

25   then occurred:

26       Q.  Then it says "only as follows," and without going into this only
         as follows, there are a bunch of specific restrictives or times and
27       places that you can drive; Correct?

28

43

A.  Is that a law book?  Are you suggesting that I was remiss, because I didn't go to a law library?  I called a lawyer, [...] and I asked when I was at the MVD, so because I have this insurance and I have my interlock I can drive now?  She said, yes.  She never gave any you could go here, but not here.  You can go here or– never, never.  I would not have been driving under those circumstances, if that his what they told me or if my lawyer had told me.  I would not have driven the car.

Q.  Well did you see that right there?

A.  Yes, I did.  But it says "restricted interlock."  I was restricted, because I needed an interlock and then I was fine.  "Restricted interlock."

Q.  So you thought the rest of that was just extraneous and had no meaning or affect?

A.  I called and I asked a lawyer what it meant.

Q.  That's not an answer to my question.  My question is did you ignore that part, which clearly gives you notice that this is a restricted license, pursuant to ARS 28-1402?  Did you ignore that explicit very clear unequivocal information on the front of your driver's license?

A.  I didn't– I called a lawyer to ask what it meant.  I called a lawyer.  Isn't that being proactive enough? [Emphasis supplied] [RT 1/8/15 p. 56, 57]

After the jury had been excused for the day and directed to return on Monday, January 12, 2015, the following proceedings occurred:

MR. SERDEN: Can I call Mr. Coffinger to the stand to explain what he told her about the ignition interlock?

THE COURT: No.

MR. SERDEN: That's now the issue.  Now she's going to rely on my attorney told me it.  I have no responsibility in this case.  I mean they are opening this can of worms.  He asked the questions, so his statement to her were completely legally wrong. [Emphasis supplied] [RT 1/8/15 p. 73]

On January 12, 2015, Comm. Richter recalled the case, at which time the parties, but not the jury, were present in courtroom.  She stated "...[W]hen we broke on Thursday, Mr. Serden had made a request to call Mr. Coffinger as a witness based upon Ms. Espinosa's testimony."[RT, 1/12/15, p. 3].  She then allowed DCA Serden to renew his request, at which time he stated:

1
2
3
4
5
6

... The State requested that it be allowed to call Mr. Coffinger for testimony. As the Court is aware, one of the elements the State has to prove is that the petitioner knew or should have known her license was revoked and/or restricted. In that circumstance, she testified that based upon a conversation she had had with Mr. Coffinger, she believed that once she got the Special Ignition Interlock Restricted Driver's License her privilege to drive was not longer revoked. So, based on that conversation, the State made an off-the-record... comment to the Court and Mr. Coffinger that it was going to request that it be allowed to call Mr. Coffinger to either confirm or deny that statement. [Emphasis supplied] [RT 1/12/15, p. 3, 4]

7

Comm. Richter then responded:

8
9
10
11

All right. And based upon the nature of Ms. Espinosa's testimony and the elements that the State must prove, I do believe that it is appropriate that the State be allowed to explore that issue with Mr. Coffinger. And given that situation, obviously, we can't proceed with Mr. Coffinger being both your lawyer and a witness in your case. So the only option I have is to declare a mistrial.... [Emphasis supplied] [RT 1/12/15, p. 4]

12
13

Comm. Richter never inquired if petitioner objected. Comm. Richter then reassembled the jury in the courtroom, and advised the jury:

14
15

Due to events that have occurred in this matter, we are no longer able to proceed with this trial. So you will not be required to participate any longer. [RT 1/12/15, p. 5]

16
17
18
19
20
21
22
23
24
25
26
27
28

Comm Richter did not make any record of her consideration of either (1) any less drastic viable alternative to her *sua sponte* declaration of a mistrial to adequately address the State's request to call defense counsel as a witness, or (2) the attorney-client privilege in criminal cases, provided in A.R.S. §13-4062(2), that absolutely precluded the State from calling defense counsel as a witness over petitioner's objection, or (3) the additional prohibitions imposed on defense counsel by the ethical requirements in Rule 42, Ariz.Supre.Ct.R., relating to his duty to preserve the confidential communications with his client. DCA Serden never moved for a disqualification of defense counsel, and Comm. Richter never conducted a hearing on whether defense counsel should be required to withdraw. Both attorneys then spoke off-the-record with the 10 trial jurors, who advised them that 3 of the jurors were inclined to return a verdict of guilty, and 7 of the jurors were

inclined to return a verdict of not guilty.  The parties and Comm. Richter then returned to the courtroom, at which time she addressed petitioner stating:

> Ms. Espinosa, you have two options: Either to continue with Mr. Coffinger as your lawyer and make sure that he does not become a witness in the retrial, or to have him be as a witness and have other counsel represent you in this matter. [Emphasis supplied] [RT 1/12/15 p. 6]. Transcript attached as Exhibit 3.

II.  Legal Discussion

    A.   The Trial Court's *Sua Sponte* Order Granting a Mistrial Without Petitioner's Consent, on the Last Day of Petitioner's Initial Four Day Trial, Without Sufficiently Exploring Other Less Drastic Viable Alternatives, was Without a Manifest Necessity, and, Therefore, a Retrial is Barred by the Double Jeopardy Prohibition, Guaranteed in Art. 2, Sect. 10 of the Arizona Constitution

A mistrial is the most dramatic remedy for trial error and should be granted only when it appears that justice will be thwarted unless the jury is discharged and a new trial granted.  *State v. Hardy*, 230 Ariz. 281, 283 P.3d 12, cert. den. 133 S.Ct. 935, 184 L.Ed.2d 732 (2012).  Accord: *State v. Speer*, 221 Ariz. 449, 212 P.3d 787, cert. den 130 S.Ct. 1520, 559 U.S. 947, 176 L.Ed.2d 126 (2010).

In *McLauglin v. Fahringer*, 150 Ariz. 274, 723 P.2d 92 (1986), the 74 year old great-grandmother of the alleged victim, was charged with molesting her four-year-old great-granddaughter.  She filed a petition for special action in the Arizona Supreme Court following the respondent judge's *sua sponte* order declaring a mistrial in her first trial in which she sought to bar her retrial based on the prohibition against double jeopardy.  The court gave the following summary of the facts and procedural history:

> Petitioner lived next door to her grandson, his wife and their children. ... The victim ultimately said that she had been molested by petitioner ("Granny")....
>
>     \*        \*        \*
>
> Prior to trial the prosecutor filed a motion *in limine* which sought to admit all the statements the victim made regarding who molested her. The state's theory was that the statements were prior consistent statements....
>
>     \*        \*        \*

The following day in the prosecutor's opening statement she stated that the victim was taken to a counseling center and told an employee, "Granny touches my private parts when she's not supposed to". Defense counsel objected based on hearsay.... Ultimately the trial court declared a mistrial *sua sponte* over petitioner's objection.

Per minute entry, the trial court noted that its reasons for declaring a mistrial were threefold: (1) the court did not want to inconvenience the jury with numerous interruptions in order to conduct evidentiary hearings pursuant to A.R.S. § 13-1416; (2) so the state could properly present admissible evidence; and (3) to protect the petitioner's interest in not being surprised at trial by the use of the statements.

*            *            *

[T]he only issue is whether the declaration of a *sua sponte* mistrial by the trial court over petitioner's objection would bar reprosecution of petitioner on double jeopardy grounds. We believe reprosecution would place petitioner twice in jeopardy.

The Double Jeopardy Clause of the Fifth Amendment protects a criminal petitioner against... repeated prosecutions for the same offense and is applicable to the states through the Fourteenth Amendment [citation omitted]. The Arizona Constitution per art. 2 § 10 also affords double jeopardy protection to criminal petitioners.

Jeopardy attaches as soon as the jury is impaneled and sworn [citations omitted]. Since jeopardy did attach in this case we must now consider whether petitioner would be twice placed in jeopardy if her case proceeds to a second trial.

...A mistrial negates the petitioner's "valued right to have his trial completed by a particular tribunal" [citations omitted]. An improperly declared mistrial is a bar to retrial, provided, however, that it was not declared with the petitioner's consent. [citation omitted] ... In instances where the trial court declares a mistrial *sua sponte*, whether the Double Jeopardy Clause permits retrial without the petitioner's consent depends on whether there is a manifest necessity for the mistrial or whether the ends of public justice will otherwise be defeated [citations omitted].

....The record in this case does not reveal any circumstances which we believe rise to the level of manifest necessity calling for the declaration of a *sua sponte* mistrial.

The record indicates that the trial court made no real effort to determine whether there were any feasible alternatives to declaring a mistrial. At the very least a short recess should have been pursued in order to determine if the statements in question were admissible and under what theory. Petitioner was without fault as to the quandary the judge found himself in when he had not promptly ruled upon the state's pretrial motions. Since the trial had begun, it is probable that the four relevant witnesses were either at the courthouse or "on call" and therefore could have been summoned to testify within a reasonable period of time. The trial court did not adequately explore the possibility of whether hearings pursuant to A.R.S. § 13-1416 could have been conducted that very day or the following day.

47

\*          \*          \*

No manifest necessity existed for the *sua sponte* declaration of a mistrial. .... We remand to the trial court with instructions to dismiss the charges against petitioner. Relief granted. [Emphasis supplied] 150 Ariz. at 274-278

In *Pool v. Superior Court*, 139 Ariz. 98, 677 P.2d 261 (1984), recon. den., the Arizona Supreme Court granted special action relief of dismissal with prejudice to the petitioner whose motion for a mistrial was necessitated by prosecutorial misconduct to avoid a probably acquittal, stating:

...[W]e find no case where this court has been presented with a fact situation where a petitioner's motion for mistrial was granted as the result of prosecutorial misconduct intended not so much to provoke a mistrial as to avoid probable acquittal or to harass a petitioner. We have stated, in refusing to bar a retrial, that the double jeopardy theory could not prevail where nothing in the record indicated that "the State engaged in any intentional misconduct or that the petitioner was in any way subjected to harassment or oppression ...." *State v. Wright*, 112 Ariz. 446, 450, 543 P.2d 434, 438 (1975) (emphasis supplied).

\*          \*          \*

... The State had made several errors in the indictment. ... The trial had not gone well. The petitioner had seized upon the defect in the indictment to raise a defense with at least surface plausibility. ... [T]he written record supports the conclusion that this prosecutor intentionally engaged in improper conduct for the purpose of forcing petitioner to seek a mistrial so that the prosecution could procure a new indictment with correct charges.

It is also possible the prosecutor had a different intent. He may have sought to avoid a serious danger of acquittal by using whatever method was available to convict, proper or improper. He may have intended to harass the petitioner without thought of the risk of mistrial because of anger at either petitioner or defense counsel. ... The Oregon Supreme Court... held that the Oregon constitutional prohibition against double jeopardy was violated:

when improper official conduct is so prejudicial to the petitioner that it cannot be cured by means short of a mistrial, and if the official knows that the conduct is improper and prejudicial and either intends or is indifferent to the [danger of] resulting mistrial or reversal. When this occurs, it is clear that the burden of a second trial is not attributable to the petitioner's preference for a new trial over completing the trial infected by error. Rather, it results from the state's readiness, though perhaps not calculated intent, to force the petitioner to such a choice. *State v. Kennedy*, 295 Or. [260] at 276, 666 P.2d [1316] at 1326 [(1983)].

48

The question has never been clearly presented to this court. We would ordinarily interpret art. 2 § 10 of the Arizona Constitution, which contains our prohibition against double jeopardy, in conformity to the interpretation given by the United States Supreme Court to the same clause in the federal constitution [citation omitted]. The decisions of the United States Supreme Court are binding with regard to the interpretation of the federal constitution; interpretation of the state constitution is, of course, our province [citations omitted]   We acknowledge, with respect, that decisions of the United States Supreme Court have great weight in interpreting those provisions of the state constitution which correspond to the federal provisions. We acknowledge that uniformity is desirable. However, the concept of federalism assumes the power and duty, of independence in interpreting our own organic law. With all deference, therefore, we cannot and should not follow federal precedent blindly. *State v. Kennedy*, 295 Or. at 268-272, 666 P.2d at 1322-24.

We cannot agree with the fundamental premise of the plurality in *Oregon v. Kennedy*, [456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982)], that a test broader than intent to provoke a mistrial, "would offer virtually no standards." *Oregon v. Kennedy*, 456 U.S. at 674, 102 S.Ct. at 2089. We agree with the opinion of Justice Stevens for the four-member minority that so specific an intent must necessarily involve a subjective inquiry and is too difficult to determine. 456 U.S. at 689, 102 S.Ct. at 2097. Also, we believe that the [*Kennedy*] Court's decision fails to give effect to its own pronouncements regarding the purpose of the double jeopardy clause. The Court acknowledges that the clause gives the petitioner an interest in having the prosecution completed by the tribunal before which the trial is commenced. This "interest" expresses a policy against multiple trials [citation omitted]. The fundamental principle is that:

> [T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty. *Green v. United States*, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957).

\*          \*          \*

In our view, therefore, the resolution of the question of when jeopardy attaches should turn upon the concept of enforcing the constitutional guarantee against double jeopardy when the right to be free from multiple trials, which that clause was meant to guarantee, would be impaired by the prosecutor's intentional, improper conduct [citation omitted]. We do not agree that standards cannot be formulated to accomplish the objectives of the clause in situations such as this. We hold, therefore, that jeopardy attaches under art. 2, § 10 of the Arizona Constitution when a mistrial is granted on motion of petitioner or declared by the court under the following conditions:

49

1. Mistrial is granted because of improper conduct or actions by the prosecutor; and

2. such conduct is not merely the result of legal error, negligence, mistake, or insignificant impropriety, but, taken as a whole, amounts to intentional conduct which the prosecutor knows [footnote omitted] to be improper and prejudicial, and which he pursues for any improper purpose with indifference to a significant resulting danger of mistrial or reversal; and

3. the conduct causes prejudice to the petitioner which cannot be cured by means short of a mistrial.

We agree with the Oregon Supreme Court that when such conduct occurs the burden of another trial cannot be attributed to petitioner's preference to start anew rather than "completing the trial infected by error" and is, rather, attributable to the "state's readiness, though perhaps not calculated intent, to force the petitioner to such a choice." *State v. Kennedy*, 295 Or. at 276, 666 P.2d at 1326. In such a situation, the State has intentionally exposed the petitioner to multiple trials for the same crime and has destroyed his expectation of completing the proceeding before the original tribunal. This is exactly what the double jeopardy provision was intended to prevent.

...[W]e are compelled to conclude that the prosecutor intentionally engaged in conduct which he knew to be improper, that he did so with indifference, if not a specific intent, to prejudice the petitioner. The purpose ... was, at best, to avoid the significant danger of acquittal which had arisen, prejudice the jury and obtain a conviction no matter what the danger of mistrial or reversal. Accordingly, we hold that jeopardy attached and retrial is barred.

\*          \*          \*

Petitioner Pool's prayer for relief is granted... The trial court shall dismiss the indictment with respect to Pool.... [Emphasis supplied]

In *State v. Breit*, 930 P.2d 792, 802 (1996), the Supreme Court of New Mexico cited *Pool*, supra, with approval, noting "like the Pennsylvania Supreme Court in *[Commonwealth v.]Smith* [532   Pa. 177, 615 A.2d 321 (1992)] a growing number of state courts have rejected or expanded upon the [U.S. Supreme Court's] *Kennedy* rule when double-jeopardy claims are urged under their own state constitutions.  Most notably is the view taken by the Oregon Supreme Court in *Kennedy* [supra]." In addition to *Pool*, the New Mexico court cited with approval the Texas Court of Criminal Appeals in *Bauder v. State* [Bauder II], 921 S.W.2d at 699 (reversing Bauder I, 880 S.W.2d 502), along with the North Carolina Court of Appeals in *State v. White*, 85 N.C.App. 81, 354 S.E.2d 324, 329 (1987), aff'd 322 N.C.

506, 369 S.E.2d 813 (1988), and the Michigan Court of Appeals in *People v. Dawson*, 154 Mich. App. 260, 397 N.W. 2d 277, 282 (1986), aff'd 431 Mich. 234, 427 N.W.2d 886 (1988).

In *State v. Aguilar*, 217 Ariz. 235, 172 P.2d 423 (App. Div. 2 2007), after the jury had been sworn, during the first day of the first trial, the State acknowledged that it had failed to make a timely disclosure of a ballistics report it wanted to introduce in evidence. The trial judge considered granting a brief postponement of the trial, but four jurors informed the judge that they would be unavailable if a continuance was granted. The judge declared a mistrial and Aguilar was forced to retrial 2 1/2 weeks later at which the State was allowed to admit the ballistic report in evidence, the petitioner was convicted, sentenced and he appealed. Div. 2 of the Court of Appeals stated:

> [The petitioner contends] his second trial was barred by the Fifth Amendment's protection against double jeopardy.1 We agree and therefore vacate the convictions and sentences entered at the conclusion of Aguilar's second trial and instruct the trial court to dismiss the charges against Aguilar with prejudice.
>
> \*          \*          \*
>
> The Double Jeopardy Clause of the Fifth Amendment, among other protections, protects a petitioner from being tried multiple times for the same criminal offense and is applicable to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056 2062, 23 L.Ed.2d 707 (1969). The Arizona Constitution provides double jeopardy protection against multiple trials through an analogous clause. See Ariz. Const. art. II, § 10 [citation omitted]. Jeopardy attaches once the jury is empaneled [citation omitted].
>
> \*          \*          \*
>
> ...When the court declares a mistrial *sua sponte*, retrial will not be barred if there was a "manifest necessity for the mistrial or ... the ends of public justice will otherwise be defeated." *McLaughlin v. Fahringer*, [supra].
>
> \*          \*          \*
>
> ... [W]hen a mistrial is declared because critical evidence for the prosecution is unavailable, we should apply the "strictest scrutiny." [citation omitted]
>
> Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict,

the prohibition against double jeopardy as it evolved in this country was plainly intended to condemn this "abhorrent" practice.

... [S]ee also *Gori v. United States*, 367 U.S. 364, 369, 81 S.Ct. 1523, 1526-27, 6 L.Ed.2d 901 (1961) (Fifth Amendment protects petitioners when "a judge exercises his authority to help the prosecution, at a trial in which its case is going badly, by affording it another, more favorable opportunity to convict the accused."). Accordingly, we must apply the strictest scrutiny here.

"Manifest necessity" can arise in many different situations and the courts have not attempted to adopt a single, all encompassing definition. See *McLaughlin*, 150 Ariz. at 277, 723 P.2d at 95 (listing various examples of manifest necessity). Although absolute necessity is not required, *Givens*, 161 Ariz. at 281, 778 P.2d at 646, the United States Supreme Court has said there are various "degrees of necessity and we require a `high degree' before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 506, 98 S.Ct. at 831. And, in *Gusler v. Wilkinson*, 199 Ariz. 391, ¶ 18, 18 P.3d 702, 706 (2001), our own supreme court stated that the prosecutor's "burden `is a heavy one.' Indeed, the very term `manifest necessity' emphasizes `the magnitude of the prosecutor's burden.'" Id., quoting *Washington*, 434 U.S. at 505, 98 S.Ct. at 830; see also *Evans v. Abbey*, 130 Ariz. 157, 159, 634 P.2d 969, 971 (App.1981) ("A mistrial is not warranted when the court ha[s] the ability to prevent its necessity.").

            *                 *                 *

Additionally, our supreme court has found that when a trial court fails to consider viable alternatives to a mistrial, manifest necessity has not been shown. *McLaughlin*, [supra]. In *McLaughlin* the trial court considered whether the trial could proceed after the prosecutor had referred to potentially inadmissible evidence during her opening statement. *Id.* at 276, 723 P.2d at 94. The trial court found it was necessary to hold evidentiary hearings on the issue before proceeding and declared a mistrial. *Id.* Our supreme court concluded that the trial court had not adequately considered alternatives such as a short recess to resolve the evidentiary issue and thus there was no manifest necessity to declare a mistrial. Id. at 277-78, 723 P.2d at 95-96.

Here, the trial court considered continuing the trial as an alternative to declaring a mistrial.... The court did not question the jurors who had indicated they were unable to return, nor is there any record of the reasons for their claimed unavailability. We find the court in this case failed to sufficiently investigate whether the four jurors had legitimate reasons for their unavailability or whether it was simply more convenient to have their duties concluded immediately. To the extent the court based its declaration of a mistrial on its finding that the jury could not reconvene after a week-long recess, the record does not support a finding of manifest necessity under the strictest scrutiny [citation omitted].

... Because a short recess could have cured the problem, the court's declaration of mistrial was, at least, premature. See *McLaughlin*, 150

Ariz. at 277-78, 723 P.2d at 95-96 (recess of twenty-four to forty-eight hours to hold evidentiary hearings feasible alternative to mistrial and thus no manifest necessity).

Finally, the alternative urged by the defense—to preclude the ballistics report and proceed with the first trial—was entirely feasible....

&ast; &ast; &ast;

The trial court expressed concern over the state being deprived of the report as evidence. But the trial court could not elevate this concern over the petitioner's right to be protected from double jeopardy. See *Washington*, 434 U.S. at 503-04, 98 S.Ct. at 829-30. Moreover, the prosecutor, rather than requesting a pretrial continuance, chose to move forward, despite the fact that he had requested a ballistics report that was not forthcoming. "The prohibition against double jeopardy unquestionably `forbids the prosecutor to use the first proceeding as a trial run of his case.'" *Id.* at 508 n. 24, 98 S.Ct. at 832 n. 24, quoting Note, Twice in Jeopardy, 75 Yale L.J. 262, 287-88 (1965). Because the trial court had feasible alternatives to declaring a mistrial, under the strictest scrutiny, there was no manifest necessity to declare the mistrial. See *id.* at 507-08, 98 S.Ct. at 831-32.

&ast; &ast; &ast;

...[H]aving additional evidence admitted against him clearly was not to Aguilar's benefit. The mistrial was intended to and clearly did benefit the prosecution. Unless the mistrial was at Aguilar's request or due to his actions, see [*State v. Givens*] [161 Ariz 278] at 280-82, 778 P.2d [643] at 645-47 [(App. Div. 1 1989)], or unless the "mistrial has been granted in the sole interest of the petitioner," *Gori*, 367 U.S. at 369, 81 S.Ct. at 1527 (emphasis added), double jeopardy bars a mistrial....

We conclude that "along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny," *Washington*, 434 U.S. at 510, 98 S.Ct. at 833, the failure of a prosecutor to discover and disclose evidence requires an exacting inquiry. Under such circumstances, we are required to strike the balance in favor of the petitioner. [citation omitted].

There was no manifest necessity and thus the trial court abused its discretion in declaring a mistrial. For this reason, retrial was barred by double jeopardy. We vacate the convictions and sentences entered at the conclusion of Aguilar's second trial and remand this matter to the trial court with instructions to dismiss the charges against Aguilar, with prejudice [citation omitted]. [Emphasis supplied]

B.   There was no Manifest Necessity for Comm. Richter's *Sua Sponte* Declaration of a Mistrial, Because (1) Pursuant to the Attorney-Client Privilege, Petitioner had the Right to Prevent the State From Calling Defense Counsel as a Witness; and (2) Defense Counsel's Ethical Obligation Requires Him to Preserve His Confidential Communications with His Client Unless His Client Gives Informed Consent

1    A.R.S.   §13-4062, entitled, "Anti-marital fact privilege; other privileged

2    communications," includes subsection (2) which provides the attorney-client privilege in

3    criminal cases, and states:

4        A person shall not be examined as a witness in the following cases:

5                     *              *              *

6        (2) An attorney, without consent of the attorney's client, as to any
         communication made by the client to the attorney, or the attorney's
7        advice given in the course of professional employment. [Emphasis
         supplied]

8
         In *State v. Fodor*, 179 Ariz. 442, 448, 449, 450, 880 P.2d 662 (App. Div. 1 1994) the
9
     court of appeals reversed the petitioner's perjury conviction, which the State established by
10
     admitting in evidence a transcript of a wire-tapped conversation between the petitioner and
11
     an attorney that she had called for legal advice.  The court ruled that the trial court's denial
12
     of petitioner's motion to suppress the transcript of the conversation was erroneous because
13
     admission of the transcript violated the attorney/client privilege, as well as the attorney's
14
     ethical obligation of preserving the confidential communications with the client, stating:
15

16        We first turn to the general principles that govern the attorney-client
         privilege. In the criminal context, "unless a client consents, a lawyer
17        may not be required to disclose communications made by the client to
         the lawyer or advice given to the client in the course of professional
18        employment." *Samaritan Foundation v. Goodfarb*, 176 Ariz. 497, 501,
         862 P.2d 870, 874 (1993) .... "The privilege is intended to encourage
19        the client in need of legal advice to tell the lawyer the truth." *Id.* Our
         supreme court further stated, "the privilege is central to the delivery of
20        legal services in this country." *Id.*

21        The test for determining whether a communication is protected by the
         attorney-client privilege is a subjective one; it focuses primarily on the
22        state of mind of the client. [citations omitted]. The trial court must
         examine the circumstances under which the communication was made
23        [citations omitted]. From those circumstances, the court must decide
         whether the party consulting the attorney believes that he or she is
24        approaching the attorney in a professional capacity and with the intent
         of securing legal advice....

25                     *              *              *

26        ...[A] lawyer's potential ethical conflict has nothing to do with whether
         a client communication with a lawyer is protected by the attorney-
27        client privilege [A.R.S.  §13-4062(2)].  As we observe above, the
         purpose of the attorney-client privilege is to encourage full disclosure
28        to a legal adviser by one seeking legal services.  For that reason, one

who seeks legal advice is entitled to claim the privilege for confidences disclosed during the initial consultation even if the lawyer later declines the representation. Charles W. Wolfram, *Modern Legal Ethics* §6.3.2, at 251-52 (1986). Thus, even had [defense attorney, Tom] Henze been disqualified from representing petitioner, the privilege would continue, together with Henze's corresponding obligation to assert it. Wolfram, *supra*, §6.3.4.

.... [T]he state's argument is contrary to the purpose of the attorney-client privilege– that of "encouraging clients to divulge matters freely to their lawyers." Wolfram, *supra*, §6.3.5; [citation omitted]. If we were to adopt the state's argument, we would effectively abolish the attorney-client privilege.

 Furthermore, although it is not necessary for us to determine whether a constitutional violation exists here, we observe that the federal courts have found constitutional implications in some violations of the attorney-client privilege. Thus, when the state "intentionally invades the attorney-client relationship or privileged information resulting from an unintentional intrusion is disclosed and prejudice results," a Sixth Amendment violation occurs. *Bishop v. Rose*, 701 F.2d 1150, 1156 (6th Cir.1983) (habeas corpus relief granted where letter from petitioner to his attorney was seized from petitioner's cell and used by state to impeach petitioner's trial testimony). Prejudice results when evidence obtained in violation of the attorney-client privilege is used against the petitioner at trial. *United States v. Irwin*, 612 F.2d 1182, 1187 (9th Cir.1980)...[Emphasis supplied]

In *State v. Holsinger*, 124 Ariz. 18, 22, 23, 601 P.2d 1054, 1058, 1059 (1979), the Arizona Supreme Court reversed the petitioner's convictions for offenses including first degree murder, entered by the former Maricopa County Superior Court Judge Sandra Day O'Connor, holding that, along with other trial errors, the prosecutor's cross-examination of petitioner regarding her confidential communications with her attorneys violated her attorney-client privilege, stating:

The attorney-client privilege, A.R.S. §13-4062(2), belongs to the client and concerns communications between the attorney and the client. The reason for the privilege is not to protect the client, but to encourage free exchange of information between the attorney and the client and to promote the administration of justice [citation omitted]. Neither the client nor the attorney can be compelled to disclose these communications against the client's wishes [citations omitted]. Neither does the petitioner in a criminal case waive the attorney-client privilege when she takes the stand to testify in her own behalf:

"To say that the broad protection of (the attorney-client privilege) is not available to a petitioner when he takes the stand in a criminal case would entail consequences far more detrimental to the interests of society than does the rejection of the evidence that might be disclosed.

55

> When the client, especially one accused of crimes, asks for advice and guidance in the premises, he should be able to speak freely without any fear and in full confidence that what is said by him or to him by his attorney will not be subsequently subject to disclosure if he takes the witness stand during the trial of his case. Any other policy than strict inviolability, unless expressly waived, would seriously hamper the administration of justice, for the client would perhaps refrain from telling the truth or withhold the truth, while the lawyer would be reluctant to give the correct advice and counsel if he thought it would be subject to disclosure in the event his client took the stand to testify in his own behalf." *People v. Shapiro*, 308 N.Y. 453, 459, 126 N.E.2d 559, 562 (1955).

In the instant case, it is clear that the effect if not the intent of the question [by the prosecutor] was to force the petitioner either to waive the attorney-client privilege or to invoke the privilege before the jury. She was thus on the horns of a dilemma she could waive the privilege which might have resulted in testimony damaging to her, or she could invoke the privilege and lead the jury to believe she had something to hide. In either case, the effect of the questioning was prejudicial to her.

> "If it be said that petitioner or her counsel could have objected when the petitioner was asked these questions as a witness placed upon the stand by the plaintiff (citation omitted), the answer is practical and that is that a party should not be put upon such onerous horns of a dilemma during a jury trial. In the forensic battlefield of a contested trial, the contrast is striking in the effect on a jury between a witness whose answers are full and frank and a witness who refuses to answer or on whose behalf objection is made whatever the merit of the basis for such refusal or objection. There is an understandable Rapport begotten between witness and jury in the one case, while in the other there is a recognizably devastating adverse effect upon the witness' standing before the jury. To render that strategy efficacious which would facilitate the imposition of the dilemma would in most cases mean that the privilege might never remain inviolate. If a contrary rule were sanctioned, what would become of the privileges not alone of patient and physician, but also of client and lawyer, and of penitent and priest . . . ? These ancient and sacred relationships are basic in our society and as such worthy of judicial safeguard. I deem them too important to warrant ruthless dissipation of that protection." *Vilardi v. Vilardi*, 200 Misc. 1043, 1045-46, 107 N.Y.S.2d 342, 344-45 (1951). (emphasis in original)

*Vilardi*, supra, was a civil case. The rationale is even more applicable in a criminal case where the petitioner is being cross-examined by the State.

56

> "(I)n a criminal case liberty is at stake, and the petitioner must not be compelled to imperil the same by an appeal to the rule of exclusion, and be left in the attitude of suppressing evidence." *People v. Werner*, 225 Mich. 18, 23, 195 N.W. 697, 698 (1923).

The questioning was error. [Emphasis supplied]

The attorney-client privilege, which is the oldest of privileges for confidential communications known to common law, is rigorously guarded to encourage full and frank communication between attorneys and their clients, and thereby to promote broader public interests in observance of law and administration of justice. *State v. Towery*, 186 Ariz. 168, 920 P.2d 290 (1996), cert. den. 117 S.Ct. 985, 519 U.S. 1128, 136 L.Ed.2d 867, den. PCR affmd 204 Ariz. 386, 64 P.3d 828, recon. den., cert. dis. 124 S.Ct. 44, 539 U.S. 986, 156 L.Ed.2d 702.

Ariz.Supr.Ct.R. 42 entitled, "Arizona Rules of Professional Conduct," includes:

ER 1.6 entitled "Confidentiality of Information," which states in part:

> (a) A lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent....

C. The State's Failure to File a Motion to Disqualify Defense Counsel, That Included the Required Allegations, Precludes the Court from Disqualifying Defense Counsel

In *Cottonwood Estates, Inc. v. Paradise Building, Inc.*, 128 Ariz. 99, 104, 105, 624 P.2d 296, 301, 302 (1981), the Supreme Court established the requirements for disqualifying an attorney based on opposing counsel's request to call the attorney as witness, stating:

> The prejudice [to the attorney's client] requirement of [former] DR 5-102(B) [replaced with ER 3.7] works to preclude the folly of an attorney giving testimony detrimental to the interest he is advocating as well as to prevent opposing counsel from contriving some tactical need for calling the attorney thereby triggering disqualification. See *Smith v. Arc-Mation* [402 Mich. 115, 261 N.W.2d 713 (1978)].... To call for the disqualification of opposing counsel for delay or other tactical reasons, in the absence of prejudice to either side, is a practice which will not be tolerated. *Phillips v. Liberty Mutual Insurance Co.*, 43 Del.Ch. 436, 235 A.2d 835 (1967); *Galarowicz v. Ward*, 119 Utah 611, 230 P.2d 576 (1951).

> By misusing the advocate-witness prohibition, an attorney might elbow opposing counsel out of the litigation for tactical reasons. *International Electronics Corp. v. Flanzer*, 527 F.2d 1288 (2d Cir. 1975); *J.P. Foley & Co. v. Vanderbilt*, 523 F.2d at 1360 (Guerin, J. Conc.).  When an attorney is to be called other than on behalf of his client, a motion for disqualification must be supported by a showing that the attorney will give evidence material to the determination of the issues being litigated, that the evidence is unobtainable elsewhere, and that the testimony is or may be prejudicial to the testifying attorney's client. [Emphasis supplied]

ER 3.7 entitled, "Lawyer as Witness" states in part:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness <u>unless</u>:
>
> \*          \*          \*
>
> (3) disqualification of the lawyer would work substantial hardship on the client. [Emphasis supplied]

The Comment to ER 3.7 states in part:

> [4] ... [P]aragraph (a)(3) recognizes that a balancing is required between the interests of the client and those of the tribunal and the opposing party.  Whether the tribunal is likely to be misled or the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses.  Even if there is risk of such prejudice, in determining whether the lawyer should be disqualified, due regard must be given to the effect of disqualification on the lawyer's client. It is relevant that one or both parties could reasonably foresee that the lawyer would probably be a witness.... [Emphasis supplied]

Undersigned counsel has represented petitioner for over three years in five successive criminal prosecutions, including the 4 day jury trial in this case.  During defense counsel's representation of petitioner, the State has not obtained a conviction against her for this offense.  Based on the procedural history of this case, it is reasonable to infer, that – by requesting to call defense counsel as a State's witness to impeach petitioner– DCA Serden was engaged in the very tactic that the late Justice Jack D. H. Hay condemned in his opinion in *Cottonwood Estates, Inc.,* supra, when he stated such practice "will not be tolerated" by the courts.  This tactic was an attempt to misuse the advocate-witness prohibition as a means to "elbow opposing counsel out of the litigation", and was the reason Comm. Richter entered her *sua sponte* mistrial order.  If defense counsel was disqualified to continue his representation of petitioner in this case, it would create a substantial hardship on petitioner

due to her financial investment in attorney's fees to undersigned counsel during the five prosecutions as well as his familiarity with the case gained during his representation of petitioner.

40.     Petitioner submits the following federal court authority in accord with the authorities petitioner has previously submitted herein in support the first part of this argument that the superior court violated her constitutional protection against double jeopardy by its denial of petitioner's motion to dismiss the information with prejudice due to its *sua sponte* mistrial declaration without a manifest necessity and petitioner's consent:

> [T]he Supreme Court recognized at an early point that the protection of verdict finality could be subverted by actions that terminated a trial prior to verdict and thereby took away from the defendant his opportunity to gain an acquittal. If such actions allowed the prosecution to begin over again, the finality of a likely acquittal could be avoided and the prosecution would have the opportunity to regroup and try again simply by not allowing the trial to proceed to a final verdict. Thus, the Court has recognized as an aspect of jeopardy bar the protection of "the defendant's valued right to have his trial completed by a particular tribunal." [citation omitted.] Implicit in this protection is the recognition not only that there must be a barrier to manipulation of a trial's termination by the prosecution, but also that the termination of a trial before a verdict is returned may hurt the defendant even without such manipulation. Every jury has its own character and the initial jury may be more favorably disposed to the defendant than the next jury. Also, apart from any difference in the trier of fact, "if the Government may reprosecute, it gains an advantage from what it learns at the first trial about the strengths of the defense case and the weakness of its own." [citation omitted.] [Emphasis supplied]

W. LaFave, J. Israel, N. King and O. Kerr, 6 *Criminal Procedure* § 25.1(b), (West 4th ed.)

Part 2: The Superior Court Committed Reversible Error by Denying Petitioner's Motion for Directed Verdict of Acquittal, Pursuant to Rule 20, Ariz.R.Crim.Pro., That She Made In Her Second Trial After the State Rested Its Case-in-Chief.

**The MD states:**

**¶24 Substantial evidence supports a conclusion that Espinosa's driver license was revoked *and* restricted at the time of the incident.**

**Petitioner's OB states on page 27:**

On page 79 of its brief, the state argues:

Here, as the trial court accurately summarized, Petitioner "essentially denied that she 'knew' her license was revoked because she relied on her attorney's advice that she was able to drive once she obtained her SIIRDL license.

Like the state's trial counsel and Comm. Richter, the state's appellate counsel ignores the fact that, on the date of petitioner's DUI arrest, the revocation of petitioner's driver license and privilege was not "revoked" by ADOT-MVD, because *it had issued her a valid SIIRDL*. The state conceded this issue in its brief, on page 5, stating:

[…] Petitioner had a restricted privilege to drive with a special ignition interlock restricted driver license ("SIIRDL").

On page 27 of her brief, petitioner summarized the testimony of Wayne Ruiz ADOT MVD records custodian that testified at her second trial, as follows:

. . .[o]n August 18, 2011, the date of her DUI arrest, petitioner had a valid driver license and privilege that was restricted pursuant to A.R.S. §§ 28-1401 and 1402, even though her three-year revocation order remained on her ADOT MVD driver license record. [R.T. October 20, 2016, p. 115, l. 19 – p. 116, l. 11] Petitioner called as a defense witness, retired MVD custodian of records Richard Schweinsburg, who testified that he recently retired from ADOT-MVD after a 20-year career. His job title during the final seven years of his employment was co-custodian of records for MVD and head of the ignition interlock section. Mr. Schweinsburg further testified during his ADOT-MVD employment, he had testified hundreds of times as to the status of persons' driver licenses. [Id. p. 140, l. 7- p.143, l. 18] Mr. Schweinsburg testified that he concurred with Agent Ruiz's testimony that, on the date of her DUI arrest, petitioner had a valid SIIRDL that was restricted pursuant to A.R.S. §§ 28-1401-02 and not for a DUI conviction. He also testified that during his 20-year MVD employment, he had never "heard of this kind of novel interpretation that you're still revoked [even] if you have a driver license." [Id. 159, l. 8-10] [Emphasis Supplied]

On page 64 of her brief, petitioner cites *State v. Mitchell*, 136 Ariz. 364 (1983), which held that:

We can thus conclude that while the piece of paper designated a "license" may be evidence of the privilege granted by the statutes to drive on the state's highways, it is the suspension, revocation or refusal of the privilege to drive by the State of Arizona which is the gravamen of the offense....

\*          \*          \*

60

We therefore hold that the word "license" as used in A.R.S. §28-[1383(A)(1)] refers to the privilege granted by the State of Arizona to use its public highways. It necessarily follows that only the State of Arizona can revoke, suspend or refuse that privilege.

The state's brief fails to cite *Mitchell, supra*, or address its holding and therefore, it has also conceded this issue. Although ADOT-MVD's three-year "revocation" of her driver license and privilege, based upon petiotpmer's 2009 Aggravated DUI conviction, remained on her driving record, it was not in effect for the period of time during which she held a valid SIIRDL. Thus, for this reason, both sub-arguments of the trial court's reversible error presented in petitioner's Argument IV of her brief – namely, 1) its *sua sponte* mistrial declaration and 2) its denial of petitioner's Rule 20 motion - are meritorious and require reversal.

### Error Based Upon *Sua Sponte* Mistrial Declaration in First Trial

The MD states:

¶6 […] Espinosa testified on cross-examination that, based on her trial attorney's advice before the incident, she did not know her driving privileges were restricted beyond the requirement that an ignition interlock device be installed in her vehicle. […] [T]he court declared a mistrial [based upon her finding that it would be "appropriate that the State be allowed" to call her attorney as a witness] and denied Espinosa's request that the case be dismissed with prejudice. [Emphasis Supplied]

In petitioner's first trial, she initially testified that on direct examination, in the defense case, co-counsel Coffinger had informed her of MVD's authority to issue her a SIIRDL, after she had served the first 90 days of her three year driver license revocation. She later testified that she never received any written notification from MVD of her SIIRDL's destination restrictions and was unaware of them on the date of the alleged offense. [R.T. January 8, 2015, p. 138-139] This testimony was corroborated by the state's witness MVD Records Custodian Wayne Ruiz, who testified that it is not the policy of MVD to provide persons issued a SIIRDL with a written notice of the destination restrictions, pursuant to A.R.S 28-1402." [*id.*, p. 69]

On cross examination, she testified that she never asked her attorney "whether there were any additional restrictions under ARS 28-1402." The prosecutor then projected a copy

of A.R.S. §28-1402 in the view of the jury and petitioner, at which time she testified:

> Is that a law book?  Are you suggesting that I was remiss, because I didn't
> go to a law library?  I called a lawyer, [...] and I asked when I was at the
> MVD, so because I have this insurance and I have my interlock I can
> drive now?  She said, yes.  She never gave any [...] you could go here, but
> not here.  You can go here or– never, never.  I would not have been
> driving under those circumstances, if that is what they told me or if my
> lawyer had told me.  I would not have driven the car. […]  I called and I
> asked a lawyer what it meant.
> ***
> […] I called a lawyer to ask what it meant.  I called a lawyer.  Isn't
> that being proactive enough? [Emphasis supplied] [RT January 8, 2015,
> p. 154, l.7-p. 155, l.10]

41.    Petitioner submits that the following federal court authority in accord with the
authority Petitioner has previously submitted in support of second Part 2 of her argument
that the superior court committed error in denying Petitioner's Motion for a Directed Verdict
of Acquittal pursuant to Rule 20 Ariz. R. Crim. P. in Petitioner's second trial.

A motion for a directed verdict of acquittal tests the legal sufficiency of the
prosecution's evidence to sustain a verdict.  It asks the question whether a reasonable juror
(or a reasonable judge in a bench trial), crediting the prosecution's testimony and drawing
all rational inferences in the prosecution's favor, could find every element of the charge
proved beyond a reasonable doubt. *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016)
("Sufficiency review essentially addresses whether 'the government's case was so lacking
that it should not have even been submitted to the jury.'...The reviewing court considers only
the 'legal' question 'whether, after viewing the evidence in the light most favorable to the
prosecution, any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.'").

The Supreme Court held in *In re Winship*, 397 U.S. 358 (1970), "that the Constitution
requires proof of guilt beyond a reasonable doubt".  This rule is applicable in state as well
as federal prosecutions and in juvenile as well as adult criminal trials. *Hurst v. Florida*, 136
S. Ct. 616, 621 (2016) ("The Sixth Amendment... 'right to...trial, by an impartial jury...'...,
in conjunction with the Due Process Clause, requires that each element of a crime be proved
to a jury beyond a reasonable doubt").  As a consequence, the constitutionally required

standard for assessing the sufficiency of the prosecution's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (*Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (empahsis omitted)). In *McDaniel v. Brown*, 558 U.S. 120, 131 (2010) (per curiam) the Supreme Court held ("reversal for insufficiency of the evidence [under *Jackson v. Virginia, supra*] is in effect a determination that the government's case against the defendant was so lacking that the trial court should have entered a judgment of acquittal").

In the law review article "Constitutionality of Directed Verdicts," by Jean Talley in Louisiana Law Review, Volume 30, Number 3, the author addresses this issuing stating:

> The United States Supreme Court has repeatedly pointed out that the constitutional right to a trial by jury (footnote omitted) is designed to protect the accused from oppression by the government (*Duncan v. Louisiana*, 391 U.S. 145 (1968); *Singer v. United States*, 380 U.S. 24 (1965); *United States ex rel. Toth v. Quaries*, 350 U.S. 11 (1955)).

> Any critical analysis of the [Sixth Amendment constitutional right of a criminal defendant to a directed verdict of acquittal] must take into account the recent United States Supreme Court decision of *Duncan v. Louisiana*, 391 U.S. 145 (1968), which extended to the states the United States constitutional requirement of trial by jury in most criminal cases. The test set forth by *Duncan* to be used in determining if a particular constitutional right binding in the federal system should be applied to the states is whether it is "fundamental – whether, that is, a particular procedure is necessary to an Anglo-American regime of ordered liberty." (*Id.* at 149) In clarifying this test the Court observed that to be applied to the states, a particular device did not have to be fundamentally fair in every criminal system imaginable but "fundamental in the context of criminal processes maintained by the American states." (*Id*)

> Recent decisions by the Supreme Court indicate that the defendant's right to trial by jury would be more accurately described as a right to trial by a *controlled* jury [citations omitted]. In *Singer v. United States*, 380 U.S. 24, 35 (1965), the court stated that "trial by jury has its weaknesses and potential for misuse. However, the mode itself has been surrounded with safeguards to make it as fair as possible." The application to the states of the sixth amendment requirement of trial by jury in criminal cases by *Duncan* will certainly mean that many of the inherent controls on the jury in the federal system must now be used in the conduct of state criminal prosecutions. It will be shown that the directed verdict is one of the most basic of these controls.

> The *Duncan* Court observed that the structure and style of criminal processes used throughout the United States are not imaginary theoretical

schemes, but actual systems bearing virtually every characteristic of the common law system which has developed in England and this country. While the directed verdict appears to be a relatively modern device, it is the result to the evolution of a very ancient jury-control procedure. The directed verdict more than meets the *Duncan* "fundamental" test; it is so inherent in the concept of trial by jury that it should be viewed as a right of which the criminal defendant should not be deprived by the states.

In *Ex Parte United States,* the United States Seventh Circuit Court of Appeals declared:

> "The essence of legal power is to take the case away from the jury, where there is an *insufficiency of evidence* to sustain a conviction. The power to direct a verdict and the power to render a judgment of dismissal pursuant to the reservation of the legal question are clearly incidental to, and necessarily flow from, the judicial function of determining the legal sufficiency of the evidence. The court has inherent power to invoke these procedural aids in its efforts to administer criminal justice." 101 F.2d 870, 878 (7th Cir. 1939) (Emphasis added)

That court added that to allow a jury verdict of guilty to stand in a case where the evidence was insufficient to send the case to the jury would be tantamount to giving the jury permission to invade a judicial power. (*Id* at 875) Other federal courts have indicated that if the evidence is insufficient the court is under a duty to grant the motion for acquittal *(France v. United States*, 164 U.S. 676 (1897); *Cephus v. United States* 324 F.2d 893 (D.C. Cir. 1963); *Collins v. United States*, 65 F.2d 545 (5th cir. 1933); *Duff v. United States*, 185 F. 101 (4th Cir. 1911); *United States v. Riganto*, 121 F. Supp. 158 (E.D. Va. 1954)) and should even raise the question of insufficiency of evidence on its own motion to prevent a miscarriage of justice. *Ansley v. United States*, 135 F.2d 207 (5th Cir. 1911). The directed verdict based on insufficiency of evidence, as a question of law, is the type of federal standard which needed, in the words of the *Duncan* Court, "are of the sort that naturally complement jury trial and have developed in connection with and in reliance upon jury trial." *Duncan v. Louisiana*, 391 U.S. 145, 150 (1968)

It would seem that these federal standards on the relative functions of judge and jury would be applied to the states by the *Duncan* decision, since such federal determinations are now interpretations of the scope of the sixth amendment protections [citation omitted].

42.   Ground Four: The Superior Court Committed Reversible Error by Denying Petitioner's Second Motion for Reconsideration of her Motion to Suppress the State's Drug Content Analysis of her Blood Sample Because the State Waived Its Alternative Argument, Pursuant to A.R.S. §13-3925, by Failing to Preserve This Argument in the Superior Court.

Petitioner presented this argument on pages 65-67 of her O.B. and on pages 42-45 of her Reply Brief.

64

1      Petitioner presented this argument on pages 9-11 in her Petition for Review:

2      On page 65 of petitioner's brief, she cites *State v. Brita*, 158 Ariz. 121, (1988), which

3  holds that the state waives, and fails to preserve for appellate review, an argument based

4  upon the statutory exception to the exclusionary rule, provided in A.R.S. § 13-3925, [the

5  Arizona statutory authority for the law enforcement officer "good faith" exception to

6  suppression of evidence obtained in a violation of a defendant's right under the Fourth

7  Amendment of the U.S. Constitution, provided in federal law by *U.S. v. Leon*, 468 U.S. 897,

8  908 (1984)], if it fails to present this argument in the superior court at the suppression

9  hearing. The state did not cite *Brita* in its brief.

10     In her reply in superior court [R.A. 108], on pages 2-5, petitioner included a more

11  extensive quote of the Arizona Supreme Court's holding in *Brita,* which states in part:

12      In *Brita*, the defendant was involved in a serious automobile crash and was
        suspected of being DUI. Brita was injured and transported to the hospital for
13      treatment. Although the investigating police officer believed that he had
        sufficient probable cause to arrest Brita for DUI, he did not arrest him at that
14      time. Instead the officer requested Brita to sign an implied consent form for
        a blood test. The officer read Brita the admonitions on the back of the form,
15      similar to the admonitions read to defendant in the case at bar, including the
        admonition that Brita's driver's license would be suspended by MVD for one
16      year if he did not sign the form. Brita signed the form, and a blood sample
        was extracted by medical personnel at the direction of the officer. The officer
17      was unaware that a sample of Brita's blood was drawn earlier for medical
        purposes. The medical sample was not the subject of Brita's motion to
18      suppress. It was evidently disposed of by medical personnel and was not
        made available to law enforcement. After the second blood sample was
19      drawn, the police arrested Brita, and he was subsequently charged with two
        counts of manslaughter and two counts of aggravated assault. Retired
20      Maricopa County Superior Court Judge Gottsfield granted Brita's motion to
        suppress his blood samples drawn by hospital personnel, pursuant to a
21      warrantless search at the direction of the police.

22      Justice James Moellner delivered the unanimous opinion in *Brita*, stating:

23      The state, throughout the trial court proceedings, contended that the sample
        was legally obtained. At no time did the state rely upon or call to the attention
24      of the trial court A.R.S. §13-3925, the "good faith exception" statute. The
        trial court, after a two-day evidentiary hearing, suppressed the test results.
25                  *          *          *          *
        ... [T]he superior court held that the test had to be suppressed because it had
26      not been taken post-arrest as required by the implied consent law, and it did
        not fall within the medical purpose exception of A.R.S. § 28-692(M) as
27      interpreted in [*State v.*] *Cocio* [147 Ariz. 277, 709 P.2d 1336 (1985)]. The
        court of appeals, in a thorough analysis we approve, agreed with the trial
28      court.

THE COURT OF APPEALS' CONSIDERATION OF A.R.S. § 13-3925

Having concluded that the trial judge had correctly decided the issues presented to him, the court of appeals reversed his ruling on an issue which had not been presented to him. In doing so, the court of appeals said:

Finally, we are mindful of the well settled rule that the ruling of the trial court on a motion to suppress will not be disturbed on appeal absent clear and manifest error. [citation omitted]  The rule, however, is not applicable here because the good faith exception to the rule of exclusion was not urged by the state in the trial court and was raised for the first time on appeal.     154 Ariz. at 522, 744 P.2d at 434.

We disagree with the court of appeals' conclusion that an appellate court is freer to reverse on issues raised for the first time on appeal than it would be on issues presented and litigated in the trial court. It is particularly inappropriate to consider an issue for the first time on appeal where the issue is a fact-intensive one. .... [A] litigant's failure to object does not require an appellate court to decide unlitigated issues when to do so violates sound principles of judicial policy.

      ... [T]he court of appeals only referred to and discussed [former] subsection A of A.R.S. § 13-3925, the "good faith exception" statute…

It is obvious merely from reading the statute that its applicability in a particular case depends upon the resolution of questions which are peculiarly factual in nature. While the state had ample opportunity to plead and argue the statute in the trial court, it did not elect to do so. Had it done so, the two-day evidentiary hearing on the motion to suppress might well have taken a decidedly different twist. It is highly undesirable to

attempt to resolve issues for the first time on appeal, particularly when the record below was made with no thought in mind of the legal issue to be decided.

Under the circumstances of this case, which deals with an obvious legal issue which could and should have been raised at the hearing, we hold that the state, never having presented the issue to the trial court even by way of a motion for reconsideration, has waived it. The court of appeals should not have considered the alleged applicability of A.R.S. § 13-3925 for the first time on appeal. [citation omitted]; [Emphasis supplied] 158 Ariz. at 123-125.

   Petitioner's reply in superior court [R.A. 108], also cited the following five other

Arizona appellate court opinions citing and in accord with *Brita*.

Namely, *State v. Hendrix*, 165 Ariz. 580, (App. Div. 1, 1990), rev. den., ("The state failed to present this position to the trial court. […] [T]he state's failure to develop this issue in the trial court prevents consideration of it on appeal; *State v. Mullen*, 168 Ariz. 246, (App. Div. 1, 1990), (The state did not argue this position to the trial court, and has thus waived appellate review.); *State v. Rogers*, 186 Ariz. 508, (1996), ([T]he issue […] was not raised by the state in the trial court and no factual record was made on it, it would be

inappropriate for an appellate court to base a ruling on that issue.); *State v. Sorkhabi*, 202 Ariz. 450, (App. Div. 1, 2002), (The State's stipulation at the hearing neither spoke to the issue raised on appeal nor suggested it as an unanswered matter needing attention by the trial court; *State v. Sisco*, 238 Ariz. 229, (App. Div. 1, 2015), ([T]he state's [failure to secure] a ruling from the trial court on [the officer's good faith exception in part resulted in its abandonment of] that argument on appeal.)

**Error Because the "Good Faith" Exception to Suppression of Petitioner's Blood Drug Content Test Was Waived by the State's Failure to Present It at Suppression Hearing**

The MD states:

**¶28** Espinosa argues the court erred in failing to reconsider the denial of her suppression motion. Espinosa appears to repeat her contention that the state waived its good faith exception argument by failing to raise it in response to the motion to suppress or in response to Espinosa's first motion for reconsideration.

**¶29** We reject this argument.[1] When the state responded to the motion to suppress, and when Espinosa first moved for reconsideration, our supreme court had yet to publish *Valenzuela* and overturn *Brito* [183 Ariz. 535 (App.Div.1-1995)]. *Brito* was, therefore, good law at the time, and the state would have no reason to argue for application of the good faith exception. By arguing for application of the good faith exception in its post-*Valenzuela* response to Espinosa's second motion for reconsideration, the state properly preserved the issue. […] [Emphasis Supplied]

Petitioner cites *State v. Brita*, 158 Ariz. 121 (1988) on page 65 of her OB and on page 42-45 of her RB, which included her citation of five other cases in accord). Neither the state's AB nor the MD cite *Brita*. In *Brown v. McClennan*, 239 Ariz. 529 (2016), the companion case decided the same day as *State v. Valenzuela*, 239 Ariz. 299 (2016), the supreme court unanimously stated

**¶16** The State also argues that we should apply the good-faith exception to the exclusionary rule to uphold the trial court's ruling.

\*\*\*

But unlike the situation in *Valenzuela*, the State here waived this argument by failing to raise it until oral argument before this Court. [Emphasis Supplied]

The MD seizes upon this correct statement in *Brown*, in support of its holding that conflicts with *Brita*. *Brown* would have been of no avail if the last quoted sentence had concluded with the words following "by failing to raise it" with the words "at the

---

[1] The MD does not apply the same standard to the state's waiver of this argument that it applies to waiver by petitioner.

suppression hearing, which argument it did not raise until oral argument before this Court."

Petitioner submits the following federal court authority in accord with the authorities Petitioner has previously submitted herein in support of this argument:

The rule of *Stone v. Powell,* 428 US 465 (1976) -that, when a state has given a full and fair chance to litigate a claim under the U.S. Constitution's Fourth Amendment, federal habeas corpus review is not available to a state prisoner alleging that his or her conviction rests on evidence obtained through an unconstitutional search or seizure.

In *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005), the court held  "Where a state court's Fourth Amendment analysis turns on a factual determination that lack fair support in the record, the federal habeas court cannot say that the state court carefully and thoroughly analyzed the facts for the purpose of the *Stone v. Powell* [428 U.S. 465 (1976)] rule.  The court held that the waiver of argument rule was not "adequate because the Illinois courts did not apply it in a consistent way."  Petitioner argues that the Arizona courts also do **not** apply the waiver of argument rule in a consistent way by applying the same standard to waivers of argument by the prosecution that it applies to waivers of arguments by the defendant.  Therefore, the *Stone* bar is not applicable to her Fourth Amendment argument. Factual determination by state appellate court was not supported by record - due to the fact that the state waived the good faith exception to suppression by failing to present it at suppression hearing.) In *Gamble v. Oklahoma*, 583 F.2d 1161 (10th Cir. 1978), the court held that a federal court is not precluded by the *Stone* [supra] case from considering Fourth Amendment claims in [28 U.S.C. § 2254] habeas corpus proceedings where the state court wilfully refused to apply the correct and controlling constitutional standards.  Petitioner submits that the state appellate court wilfully refused to apply the correct and controlling standard, – applicable to both the prosecution and the defense – that a party waives an argument such as the state's waiver of the law enforcement officer's good faith exception to suppression of evidence obtained as a result of a Fourth Amendment violation in the police drawing a DUI suspect's blood sample as a result of using inherently coercive implied consent admonitions by failing to preserve this argument in its response to the

defendant's motion to suppress or at the state court suppression hearing.

In *United States v. Dupree,* 617 F.3d 724, 727 (3ʳᵈ Cir., 2010), the majority opinion written by Judge Hardiman rejected the prosecution's argument that it had not waived a particular argument against the defendant's motion to suppress, by its failure to present that argument in the district court, in its response to the defendant's motion to suppress, stating:

> I begin with the well-established proposition that arguments not raised in the district courts are waived on appeal. [Footnote omitted]

> See *Steagald v. United States*, 451 U.S. 204, 209, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). This general principle applies fully to criminal cases involving motions to suppress. See id.; *United States v. Stearn*, 597 F.3d 540, 551 n. 11 (3d Cir.2010). Thus, when a party seeks reversal of a suppression ruling on appeal, any arguments not raised in the district court are waived absent a showing of good cause, and plain error review does not apply. [Footnote omitted]  *United States v. Rose*, 538 F.3d 175, 184 (3d Cir.2008); see also Fed.R.Crim.P. 12(e). Just as a defendant may not introduce new "theories of suppression" on appeal that were never argued below, *United States v. Lockett*, 406 F.3d 207, 212 (3d Cir.2005), the Government is "subject to the ordinary rule that an argument not raised in the district court is waived on appeal[,]" Stearn, 597 F.3d at 551 n. 11 (citing Steagald, 451 U.S. at 209, 101 S.Ct. 1642).

> This raise-or-waive rule is essential to the proper functioning of our adversary system because even the most learned judges are not clairvoyant. See *United States v. Nee*, 261 F.3d 79, 86 (1st Cir.2001). Thus, we do not require district judges to anticipate and join arguments that are never raised by the parties. See *United States v. Griffiths*, 47 F.3d 74, 77 (2d Cir.1995). Instead courts rely on the litigants not only to cite relevant precedents, but also to frame the issues for decision. See id. ("The government was required to offer some argument or development of its theory. It failed to do so, and has therefore waived the issue."). [Emphasis submitted]

In *State v. Hargrave*, 225 Ariz.1, 9, the supreme court recognized the waiver provision of the contemporaneous objection rule which is applicable to both the prosecution and the defense in criminal cases.  The *Hargrave* court cited its opinion in *Estate of Reinen v. N.Ariz. Orthopedics, Ltd.*, 198 Ariz 283, 286 ¶9, in which it stated:

> An objection to proffered testimony must be made either prior to or at the time it is given, and failure to do so constitutes a waiver.  This contemporaneous objection rule has been applied by us in numerous contexts. [citation omitted] ("The purpose of a contemporaneous objection requirement is to allow for an immediate remedy for potentially improper or unconstitutional activities"); . . . The court of appeals stated in *State v. Swafford* that "if an objection is made at some point in time during the trial where the court may take [appropriate] action. . ., then the objection will be

1  considered timely.

2  The waiver of argument rule is a parallel rule to the contemporaneous object rule.

3  The state was subject to the "waiver of argument rule" by failing to alternatively argue the

4  law enforcement officer good faith exception to the requirement of suppression of evidence

5  obtained in violation to the Fourth Amendment. In *Brown v. McClennen, supra*, the Arizona

6  Supreme Court applied the "waiver of argument rule" to the prosecution because – like the state in

7  the charge offense – the state failed to argue the good faith exception in either its response to the

8  defendant's motion to suppress or at the suppression hearing.  The supreme court reversed the

9  defendant's conviction for the charge of OUI (operating a water craft while under the influence of

10  intoxicating liquor) in violation of A.R.S. §5-395, and granted Brown a new trial at which the state

11  would be unable to introduce evidence of his alcohol concentration test results that were suppressed

12  due to the law enforcement officer's Fourth Amendment violation.  This violation occurred when

13  the law enforcement officer obtained the defendant's breath sample after reading him  inherently

14  coercive admonitions that were identical to the ones read to petitioner.   In the companion case to

15  *Brown*,  *State v. Valenzuela*, the supreme court applied the law enforcement officer good faith

16  exception and therefore affirmed the defendant's conviction for felony aggravated DUI, in spite of

17  the fact that the law enforcement officer obtained Valenzuela's blood sample for the state's blood

18  alcohol concentration analysis after reading him the identical admonitions on the "implied

19  consent/admin per se" form because the state had preserved this argument, in its response to the

20  defendant's motion to suppress.

21  43.    Ground Five:  The Superior Court Committed Reversible Error by Denying
22  Petitioner's Motion for Alternative Relief, Including Dismissal of
the Charge, With Prejudice, Based on the State's Violation of Its
23  Duty to Collect and Preserve Until Time and Trial, a Sample of Her
Blood for Her Independent Chemical Analysis.

24  Petitioner presented this argument on pages 67-71 of O.B. and on pages 45- 47 of

25  her R.B.

26  Petitioner presented this argument on page 11in her Petition for Review:

27  ¶**34** Because Espinosa had an unfettered opportunity to obtain an independent blood
sample for testing, the state did not violate her due process rights by inadvertently
28  destroying the second blood sample. [Emphasis Supplied]

This statement in the MD is erroneous and conflicts with numerous controlling Arizona appellate court cases, including its holding in *State v. Kemp*, [supra] and *State v. Velasco and Alday* (RPI), [supra] [as well as the U.S. Supreme Court's opinion in *Youngblood*, supra].

In petitioner's O.B., on pages 67-71, she cited numerous Arizona cases holding that, in a DUI prosecution, the state is required to collect and preserve until time of trial a sample of the defendant's blood or breath, for his or her independent chemical analysis if the state collects a sample from the defendant and has its expert analyze it it presents evidence of the results of the analysis at trial.  One of the cases cited by the state is *State v. Kemp*, 168 Ariz. 334 (1991). The state cites *Kemp* on pages 53, 90, 95, 96, and 97 of its brief; however, it argues that *Kemp* is not dispositive of this issue and in fact, it argues, on page 95, that it is "irrelevant" to it. Petitioner incorporates her argument that she presented herein on pages 32-33 of her reply in support of this argument.

On page 70 of petitioner's O.B., she included the following portion of footnote 4, from *Kemp*:

> [The court held that an independent test advisory was not required by police]... at least when the sample taken by law enforcement officers will still be available for testing by the defendant at the time of trial. [4]

> [4]This defendant, at the hearing on his motion to suppress, failed to show that his blood sample was unavailable for independent testing. Therefore, he did not demonstrate a due process violation. […][Emphasis supplied]

On page 33 of her R.B., petitioner also cites *State v. Velasco and Alday (RPI)*, 165 Ariz. 480, 487 (1990), a DUI criminal case in which the state administered a breath test to the defendant to present evidence of his alcohol concentration. On page 68 of petitioner's O.B., she also cites *Alday* and included two quotes from that opinion. The following is a more expansive quote from *Velasco and Alday RPI*, in which the previously quoted portions of the opinion in petitioner's O.B. are indicated in bold face type:

> The state points out that subsequent to our decisions in *Scales* [*v. City Court*, 122 Ariz. 231(App.Div. 1, 1979)] and *Baca* [*v. Smith*, 124 Ariz. 353 (1979) reh.den.], the United States Supreme Court held that the due process clause of the fourteenth amendment does not require the state and its agencies to preserve breath samples of DUI defendants for independent testing. [Citation

Omitted] Thus, the state argues, much of the underlying rationale of *Scales* and *Baca* and many of the authorities cited or relied on by those cases are no longer viable. […]

We believe *Arizona v. Youngblood,* [488 U.S. 515 (1988)] is inapposite. That case dealt with the destruction of clothing containing semen stains, and as the Court noted, "unlike in *Trombetta*, the state did not attempt to make any use of the materials in its own case in chief." Id., 488 U.S. at 56, 109 S.Ct. at 336. In the case before us, like *Trombetta* but unlike *Youngblood*, the state did use "the materials"--the defendant's breath and its test results--in its case in chief. **Blood alcohol test results in a § 28-692(B)** [renumbered (with modification) to A.R.S § 28-1381(A)(2), effective October 1, 1997] **prosecution are not merely "potentially useful" evidence, they are virtually the entire evidence**. A person may not be convicted of a violation of subsection (B) without evidence of chemical analysis of blood, breath, or urine showing a BAC in the proscribed range. *State v. Superior Court*, 149 Ariz. at 279, 718 P.2d at 181 (1986).

***

…[M]ere capture and delivery to the defendant of a sample in the state's possession that otherwise would be discharged and dissipated is not an onerous burden on the state. […]

***

…[**I**]**t is one thing to say that the police need not prepare the defendant's case, and it is quite another to say that principles of fundamental fairness permit the police to knowingly destroy or dissipate that which they systematically obtain for their own testing and evidentiary use, especially when they may keep such evidence without any significant burden and are aware the evidence may be of value to the defense.** [Emphasis by Underlining Supplied]

In *Youngblood* , supra the U.S. Supreme Court stated:

Respondent Larry Youngblood was convicted by a Pima County, Arizona, jury of child molestation, sexual assault, and kidnaping.  The Arizona Court of Appeals reversed his conviction on the ground that the State had failed to preserve semen samples from the victim's body and clothing.  153 Ariz. 50, 734 P.2d 592 (1986).  We granted certiorari to consider the extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant.

+++

At the hospital, the police also collected the boy's underwear and T-shirt.  This clothing was not refrigerated or frozen.

+++

On November 8, 1983, Edward Heller, a police criminologist, examined the sexual assault kit.  He testified that he . . . did not perform any other tests, although he placed the assault kit back in the refrigerator. . .He did not test the clothing at this time.

72

In January 1985, the police criminologist examined the boy's clothing for the first time.  He found one semen stain on the boy's underwear and another on the rear of his T-shirt.  The criminologist tried to obtain blood group substances from both stains using the ABO technique, but was unsuccessful.  He also performed a P-30 protein molecule test on the stains, which indicated that only a small quantity of semen was present on the clothing; it was inconclusive as to the assailant's identity.  The Tucson Police Department had just begun using this test, which was then used in slightly more than half of the crime laboratories in the county.

Respondent's principal defense at trial was that the boy had erred in identifying him as the perpetrator of the crime.  In this connection, both a criminologist for the State and an expert witness for respondent testified as to what might have been shown by tests performed on the samples shortly after they were gathered, or by later tests performed on the samples from the boy's clothing had the clothing been properly refrigerated.  The court instructed the jury that if they found the State had destroyed or lost evidence, they might "infer that the true fact is against the State's interest."  [Referred to as a "*Willets* Instruction" based upon the Arizona Supreme Court's approval of it in *State v. Willits*, 96 Ariz 184, 187, 393 P.2d 274, 277-8 (1964).]

The jury found respondent guilty as charged, but the Arizona Court of Appeals reversed the judgment of conviction.  It stated that "'when identity is an issue at trial and the police permit the destruction of evidence that could eliminate the defendant as the perpetrator, such loss is material to the defense and is a denial of due process.'" 153 Ariz., at 54, 734 P.2d, at 596, . . .The Supreme Court of Arizona denied the State's petition for review, and we granted certiorari. . . .We now reverse.

Decision of this case requires us to again consider "what might loosely be called the area of constitutionally guaranteed access to evidence."

. . .respondent's expert had access to the swab and to the clothing.

Our most recent decision in this area of the law, *California v. Trombetta*, 467 U.S. 479 (1984), arouse out of a drunken driving prosecution in which the State had introduced test results indicating the concentration of alcohol in the blood of two motorists.  The defendants sought to suppress the test results on the ground that the State had failed to preserve the breath samples used in the test.  We rejected this argument for several reasons:. . .third, even if the samples might have shown inaccuracy in the tests, the defendants had "alternative means of demonstrating their innocence.". . .In the present case, the likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than it was in *Trombetta*, but here, unlike in *Trombetta*, the State did not attempt to make any use of the materials in its own case in chief.

In this case, the police collected the rectal swab and clothing on the night of the crime; respondent was not taken into custody until six weeks later.  The failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent.  None of this information was concealed from respondent at trial, and the evidence - such as it was - was made available to respondent's expert who declined to

perform any tests on the samples.. . .It follows, therefore, from what we have said, that there was no violation of the Due Process Clause.

The judgment of the Arizona Court of Appeals is reversed,.. .Reversed.

## PRAYER FOR RELIEF

Because Ms. Espinosa has presented and exhausted, in her state court direct appeal, her claims that her rights under the U.S. Constitution were violated during the superior court proceedings that resulted in its entry of its judgement of guilt and sentence – which included her presentation of her claims to the Arizona Supreme Court - the state's highest court - she asks this court to grant her relief on those claims, pursuant to 28 USC 2254; Ms. Espinosa asks this Court to:

A.      Order the state to answer this petition;

B.      Conduct discovery and hold an evidentiary hearing, if appropriate;

C.      (1) Vacate Ms. Espinosa's judgment of guilt and sentence, (2) order that she be released from state court custody, and (3) order that the state court charge against her be dismissed, with prejudice, and;

D.      Grant her any other relief that is just and practicable.

RESPECTFULLY SUBMITTED this 3rd day of August, 2018.

/s/  Richard D. Coffinger
RICHARD D. COFFINGER
Co-Counsel for Petitioner

/s/  Tom Crowe
TOM CROWE
Crowe & Scott, P.A.
Co-Counsel for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2018, I caused the foregoing document to be filed with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF system.  I further certify that all case participants are registered CM/ECT users and that service will be accomplished by the CM/ECT system.

By  s/ T. Ellison